PEOPLE v KANAAN
PEOPLE v EIGHT MILE ROAD DENTAL, PC

Docket Nos. 275264 and 275266. Submitted April 9, 2008, at Lansing.
Decided April 17, 2008, at 9:05 a.m.

Ahmad Ali Kanaan, D.D.S., and Eight Mile Road Dental, P.C., were
convicted, following a bench trial in the Ingham Circuit Court,
Joyce Draganchuk, J., of 11 counts of filing false Medicaid claims
under the Medicaid False Claim Act (MFCA), MCL 400.601 *et seq.*,
in connection with dental services provided to three patients. The
defendants brought separate appeals, and the appeals were con-
solidated. Both defendants alleged that the evidence was insuffi-
cient to show that the submitted Medicaid claims were false or
that, if the claims were false, the defendants had knowledge that
the claims were false. The defendants also alleged that the MFCA
is preempted by 42 USC 1320a-7b, a federal criminal statute that
addresses Medicaid fraud and that has a stricter *mens rea* require-
ment than the MFCA.

The Court of Appeals *held*:

The MFCA is not preempted by 42 USC 1320a-7b and there
was sufficient evidence to sustain the convictions.

1. MCL 400.607(1) allows for a conviction when a defendant
has actual or constructive knowledge that a Medicaid claim is false
and that the claim is substantially certain to cause the payment of
a Medicaid benefit. MCL 400.602(f) provides that errors or mis-
takes do not constitute "knowing" conduct, unless the defendant's
course of conduct indicated a systematic or persistent tendency to
cause inaccuracies. Federal law does not permit a conviction where
the defendant lacks actual knowledge that the claim was false or
acted without intent to commit Medicaid fraud.

2. Medicaid is a program that uses a form of cooperative
federalism by which coordinated state and federal efforts coexist
within a complementary framework in regard to administration.
Although the federal program imposes conditions and rules on the
states in order for the states to participate in the Medicaid
program, the states are not left without power and authority to set
parameters and controls relative to Medicaid. The detailed federal
statutory scheme does not require a finding of federal preemption

on every matter arising out of the Medicaid program. The title of the Social Security Act that encompasses 42 USC 1320a-7b does not contain any suggestion that Congress intended to solely dominate and control the field of criminal prosecutions for Medicaid fraud under 42 USC 1320a-7b.

3. The Medicaid program or act, Title XIX of the Social Security Act, 42 USC 1396 *et seq.*, contains express provisions indicating that Congress envisioned and does permit prosecutions under state law for Medicaid fraud, and there is no indication that the applicable state law must be entirely consistent with the federal law. There is no evidence of a congressional intent, under either the theory of express preemption or the theory of implied preemption, to preempt the MFCA.

4. There was sufficient evidence showing that the claims filed by the defendants were false and that the defendants had actual or constructive knowledge that the claims were false.

Affirmed.

HEALTH — MEDICAID — FRAUD — PROSECUTIONS UNDER STATE LAW.

The provisions of the state's Medicaid False Claim Act relating to the filing of a false claim are not preempted by the provisions of the Social Security Act that pertain to the filing of a false Medicaid claim, and the Social Security Act does not preclude prosecutions under state law for Medicaid fraud (MCL 400.607[1]; 42 USC 1320a-7b).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Mark W. Matus*, Assistant Attorney General, for the people.

*Butzel Long* (by *Max R. Hoffman, Jr.*, and *Debra A. Geroux*) for the defendants.

Before: WILDER, P.J., and MURPHY and METER, JJ.

MURPHY, J. Following a bench trial, defendants were convicted of 11 counts of filing false Medicaid claims under the Medicaid False Claim Act (MFCA), MCL 400.601 *et seq.*, relative to dental services performed on three patients. Defendant Ahmad Ali Kanaan, D.D.S. (Kanaan), was sentenced to one day in jail with credit

for one day served, and he was ordered to pay restitution to the state in the amount of $532, along with fines totaling $1,100 and other various costs. Defendant Eight Mile Road Dental, P.C. (Eight Mile Dental or the office), was also ordered to pay a fine of $1,100, as well as a variety of costs. On appeal, defendants argue that the evidence was insufficient to show that the submitted Medicaid claims for dental services were false and insufficient to establish assuming falsity, that defendants had knowledge that the claims were false. The thrust of defendants' argument concerning sufficiency is that the falsehood of the claims was subject to differing opinions by the dentists who testified regarding the identification of restored tooth surfaces, and, therefore, criminal liability under the MFCA was inappropriate. Defendants also maintain that the MFCA is preempted by 42 USC 1320a-7b, which is a federal criminal statute addressing Medicaid fraud that has a stricter *mens rea* requirement than the MFCA. We affirm, holding that the MFCA is not preempted by 42 USC 1320a-7b and that there was sufficient evidence to sustain the convictions.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Kanaan was the sole dentist practicing at Eight Mile Dental during the period relevant to the criminal charges filed by the prosecution. Paulette Carter worked for defendants as the office manager from 1999 until March 2006. She explained the procedures followed in the office for preparing patient records and treatment plans. According to Carter, Eight Mile Dental recorded patient information on a two-part carbon form referred to in the office as a "white." The white form contained a list of numbers that corresponded to a patient's teeth, as well as various personal information,

including the patient's name, phone number, and insurance carrier. Carter testified that Kanaan would perform an inspection of the patient's mouth and would call out any problems requiring treatment to a dental assistant who would then record that information on the white form. Carter stated that whenever Kanaan performed work according to the treatment plan outlined on the white form, he would place his initials on the form next to the number indicating the treated tooth.

Carter indicated that, in order to bill a procedure to a patient, his or her insurer, or Medicaid, the office assistant would enter the information from the white form onto a computer billing program using various codes corresponding to the tooth number, the dentist's identification number, and the code number given to the procedure by the American Dental Association (ADA). Carter testified that typically she would check the white form against the computer screen to ensure that the information was entered accurately. According to Carter, Kanaan reviewed the patients' charts and compared them with the claim form generated by the computer, as did Carter. She agreed that "the responsibility for everything in the chart was basically that of Doctor Kanaan."

Carter testified that following electronic submission of the claims to Medicaid, payment would be received in the form of a "bulk check," which Carter would enter into the computer program, checking to make sure that the amount of the check balanced with the amounts of the claims.

At some point, Dr. Thomas Haupt, a dentist, was asked by the Michigan Attorney General's Office to examine some of Kanaan's patients in regard to an investigation of suspected false Medicaid billings.

Haupt had previously assisted the Attorney General in other Medicaid-fraud investigations concerning dental services. Haupt testified that under a contract with the Attorney General, he examined patients for evidence of tooth restorations following decay (placement of fillings) that Kanaan had supposedly performed and billed to Medicaid. Haupt indicated that he performed tooth-decay restorations in his practice, which involves filling the tooth with either an amalgam or a composite substance. He explained that an amalgam filling is silver, gray, or black in appearance, and is a mixture of silver, mercury, and other alloys, whereas a composite filling is made of acrylic and can be matched to the natural color of the tooth. Haupt asserted that in his examinations of the three patients who received dental services that gave rise to the charges, he checked to see whether the various surfaces of a particular tooth that had been reported as being treated and restored by defendants had in fact been restored. Tooth surfaces include, as relevant here, mesial, occlusal, distal, facial, and lingual. These surfaces are referenced for billing purposes and in the record by their first initial, i.e., M, O, D, F, and L.[1] Haupt testified that it is "very obvious" to him upon examination whether a restoration or other treatment has been performed on a particular tooth. Haupt stated that he also looked at x-ray films of the patients' teeth, but that, because of the two-dimensional nature of the x-ray films, their usefulness as a tool in ascertaining whether and where a restoration had taken place was limited.

Haupt testified that he examined one of Kanaan's patients, Aleace Dandridge, who was reported to have had an amalgam filling on the MODLF surfaces of a tooth identified as "tooth number two." Instead, Haupt

---

[1] We shall also use these initials for purposes of this opinion.

found a restoration on only the MOD surfaces of the tooth. Similarly, in his examination of tooth number 13, which should have had a DOL amalgam filling according to the billing report, Haupt found only a DO amalgam filling. Further, on the basis of his review of Dandridge's x-rays, Haupt testified that the L surface was not in need of restoration on tooth number 13. He additionally testified that where, according to the Medicaid billing records, there should have been an MLF composite filling on tooth number 9, he found only an ML composite filling.

Haupt also examined Shelby Schantel, another patient treated by Kanaan. According to the billing records, Schantel was supposed to have had a DOLF amalgam filling on tooth number 5, but Haupt found only a DO amalgam filling. Haupt checked for an MODLF amalgam filling on tooth number 12, but found only an MOD amalgam filling. On Schantel's tooth number 13, Haupt found only an MOD amalgam filling, where an MODLF amalgam filling was reported to have been made. Haupt further found an "occlusal and a separate facial amalgam" on Schantel's tooth number 16, where Medicaid had been billed for an MOLF amalgam filling. For Schantel's teeth numbers 6 and 17, respectively, an MLF composite filling and an MOF amalgam filling were reported, but only a facial composite filling and an OF amalgam filling were detected.

Finally, Haupt examined Ava Anderson, a minor. Because Anderson still had her baby teeth, the office used a different reference system to identify her teeth than that used to identify the teeth of the adult patients. According to Anderson's dental records, Kanaan had performed an MOLF amalgam filling on Anderson's tooth letter J; however, when Haupt examined her he found only an MOL amalgam filling. Similarly,

Haupt's examination of tooth letter T revealed that there was an O amalgam filling, but defendants had billed for an MO amalgam filling.

Another dentist, Dr. Mert Aksu, testified as an expert witness for defendants. Aksu testified that a dentist's assessment of whether a restoration has been performed on a certain tooth surface is dependent on the dentist's ability to distinguish one tooth surface from another. According to Aksu, a "line angle" demarcates where one surface ends and another begins; this angle is subject to disagreement between dentists, and when teeth are rotated in the jaw, it creates further difficulty for a dentist to perceive the different surfaces. Aksu did not personally examine the patients at issue, but rather reviewed the x-rays taken by Haupt, as well as photographs of the disputed teeth.

With respect to Dandridge, Aksu testified that on tooth number 2, where Haupt found only a three-surface MOD restoration for which a five-surface MODLF one had been reported, he believed that "at one time" the filling had "occupied the facial surface" and that the restoration had originally been on four surfaces. Aksu also disagreed with Haupt's findings of a DO amalgam filling on Dandridge's tooth number 13, which was billed as a DOL amalgam. Aksu found an "extension or encroachment [of the filling] on the lingual surface" of the tooth based on his review of photographic and x-ray images of the tooth. On tooth number 9, with respect to which Haupt found an ML composite filling where an MLF composite filling should have been, Aksu found a composite filling on the "facial view" of a picture of the tooth in addition to fillings on the mesial and lingual surfaces. Aksu's study of the pictures of Schantel's teeth also resulted in discrepancies between his findings and those of Haupt

on Schantel's teeth numbers 5, 12, and 13. Aksu did not testify about any disagreements with Haupt regarding the restorations on Anderson's teeth.

The trial court found that the only elements in controversy were whether the Medicaid claims submitted by defendants were false and whether defendants knew they were false, given that neither party disputed the fact that billing claims for the tooth restorations were made to Medicaid. The court stated that the fact that Haupt and Aksu disagreed on some of the teeth in controversy did not create reasonable doubt. Further, the trial court concluded that Haupt's testimony was the most persuasive because Aksu's opinions were based entirely on photographs and x-rays of the teeth, rather than physical examinations of the patients, which were conducted by Haupt. The trial court found that, because the photographs "do not fully show dimension . . . and only Dr. Haupt . . . had the opportunity to observe the dimension and contour of the teeth in issue," the basis for his opinions was stronger than that of Aksu's opinions. The court found defendants guilty of 11 counts of filing false Medicaid claims under the MFCA. Defendants appeal as of right.

II. ANALYSIS

A. FEDERAL PREEMPTION

Defendants argue that federal law preempts the MFCA, requiring reversal of defendants' convictions under the MFCA. The issue whether federal law preempts state law is a legal question that this Court reviews de novo on appeal. *Thomas v United Parcel Service*, 241 Mich App 171, 174; 614 NW2d 707 (2000). Because defendants failed to raise this issue below, we review the issue for plain error affecting defendants'

substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). If indeed defendants could not be convicted under state law because of federal preemption, there would necessarily exist plain error affecting defendants' substantial rights because the trial court would have been deprived of subject-matter jurisdiction. *Ryan v Brunswick Corp*, 454 Mich 20, 27; 557 NW2d 541 (1997) ("Where the principles of federal preemption apply, state courts are deprived of subject matter jurisdiction."), abrogated in part on other grounds in *Sprietsma v Mercury Marine*, 537 US 51, 63-64 (2002). For this reason, any thought that defendants waived the preemption argument on the basis that they expressly and affirmatively presented arguments under the MFCA must be rejected because defects in subject-matter jurisdiction cannot be waived. *People v Richards*, 205 Mich App 438, 444; 517 NW2d 823 (1994).

Before addressing the specifics of defendants' preemption argument, we shall first review the various statutory provisions implicated in this case and related authority in order to give the proper context to the issues presented. Defendants were convicted pursuant to MCL 400.607, which provides, in pertinent part:

> (1) A person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act . . . upon or against the state, *knowing the claim to be false.*
>
> \* \* \*
>
> (3) A person who violates this section is guilty of a felony, punishable by imprisonment for not more than 4 years, or by a fine of not more than $50,000.00, or both. [Emphasis added.]

The term "knowing," as used in MCL 400.607(1), is subject to the definition contained in MCL 400.602(f), which provides:

"Knowing" and "knowingly" means [sic] that a person is in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a medicaid benefit. Knowing or knowingly does not include conduct which is an error or mistake unless the person's course of conduct indicates a systematic or persistent tendency to cause inaccuracies to be present.[2]

Accordingly, actual knowledge that a Medicaid claim is false is not required to support a conviction. Rather, a conviction can be sustained on the basis of evidence showing that a defendant should have been aware that the nature of his or her conduct constituted a false claim for Medicaid benefits, akin to constructive knowledge. But the "should be aware" language is somewhat affected by the reference in the second sentence of MCL 400.602(f) that errors or mistakes do not constitute "knowing" conduct, unless the defendant's course of conduct indicated a systematic or persistent tendency to cause inaccuracies. The language in MCL 400.607(1) and MCL 400.602(f) was construed in *People v Perez-DeLeon*, 224 Mich App 43, 48-50; 568 NW2d 324 (1997), wherein this Court, addressing and rejecting a constitutional challenge to the statutes predicated on an alleged lack of a culpable *mens rea*, stated:[3]

By their terms, these statutes proscribe presentation of

---

[2] We also note the following language in MCL 400.608(1) that pertains to the issue of knowledge:

In a prosecution under this act, it shall not be necessary to show that the person had knowledge of similar acts having been performed in the past by a person acting on his or her behalf, nor to show that the person had actual notice that the acts by the persons acting on his or her behalf occurred to establish the fact that a false statement or representation was knowingly made.

[3] The Court's discussion encompasses MCL 400.607(1) and MCL 400.602(f), as well as the Health Care False Claim Act, MCL 752.1001 *et*

a Medicaid or health-care claim with knowledge that the claim is false. "Intent and knowledge can be inferred from one's actions and, when knowledge is an element of an offense, it includes both actual and constructive knowledge." Therefore, it is not problematic that these statutes define "knowing" to include "should be aware." Contrary to defendants' contention, this actual or constructive knowledge element does not relate solely to knowledge that a claim is filed. The knowledge element relates to both "the nature of his or her conduct *and* that his or her conduct is substantially certain to cause the payment of a [Medicaid or] health care benefit." In the context of the basic charges at issue—presenting a claim, knowing the claim to be false contrary to MCL 400.607(1) . . .—the the [sic] "nature of his or her conduct" language in the "knowing" definitions must refer to falseness. Accordingly, the actual or constructive knowledge element of these offenses appropriately requires knowledge of both the falseness of a claim and that the claim is substantially certain to cause payment of a benefit.

The final sentence of both acts' definition of "knowing" states that "knowing" does not include "conduct which is an error or mistake . . . ." The "error or mistake" language expressly excludes innocent errors from the "knowing" definition. We believe that this exclusion was not strictly necessary, because innocent errors clearly would not otherwise be included within the scope of knowingly presenting a false claim.

The acts then exclude from this innocent errors exclusion circumstances where "the person's course of conduct indicates a systematic or persistent tendency to cause inaccuracies to be present." . . . A system, method, or plan to cause inaccuracies indicates actual knowledge of falseness, while the constant repetition of inaccuracies indicates constructive knowledge of falseness. Contrary to defendants' suggestion, the "persistent tendency" language of

---

*seq.*, which contains language comparable to the MFCA, and which addresses false claims presented to health-care corporations and insurers. *Perez-DeLeon, supra* at 47-48.

the exclusion from the exclusion does not criminalize innocent errors merely because they are repeated; rather, we believe that it is intended to criminalize inaccuracies that are sufficiently persistent that the party may be charged with constructive knowledge of their falseness. . . . Thus, this exclusion from the exclusion covers circumstances in which actual or constructive knowledge of falsity may be assumed because of the systematic or persistent nature of inaccuracies. . . . Where such actual or constructive knowledge exists, the conduct would not properly fit within the exclusion for innocent errors. [Citations omitted; emphasis in original.]

Consistent with *Perez-DeLeon*, MCL 400.607(1) allows for a conviction when a defendant has actual or constructive knowledge that a Medicaid claim is false and that the claim is substantially certain to cause the payment of a Medicaid benefit.[4] This is not entirely consistent with federal law governing Medicaid fraud prosecutions, which requires a *mens rea* of actual knowledge and willfulness to support a conviction; constructive knowledge will not suffice. Particularly, 42 USC 1320a-7b(a)(1) provides for criminal penalties when a defendant "knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program[.]" This includes a claim for payment under the Medicaid pro-

---

[4] We emphasize that, where there is an absence of actual knowledge that a Medicaid claim is false, simple errors or mistakes in billing Medicaid do not give rise to criminal liability, unless a defendant's course of conduct reflects a systematic or persistent tendency to cause inaccuracies. MCL 400.607(1); MCL 400.602(f). It would be unrealistic and unreasonable to expect even the most conscientious and caring dentist or physician to never make an error when submitting a Medicaid claim. And clearly the Legislature recognized this by including the "error or mistake" language in MCL 400.602(f), which gives a level of protection to those dedicated medical providers who willingly treat the poor and disadvantaged in our communities.

gram. 42 USC 1320a-7b(a)(1), (f)(1), and (f)(2); 42 USC 1320a-7(h)(1); 42 USC 1396 *et seq.* In *United States v Laughlin*, 26 F3d 1523, 1526 (CA 10, 1994), the United States Court of Appeals for the Tenth Circuit held that to be convicted of Medicaid fraud under 42 USC 1320a-7b(a)(1), "a defendant must know that the claims being submitted are, in fact, false." Furthermore, in *United States v Starks*, 157 F3d 833, 838 (CA 11, 1998), the United States Court of Appeals for the Eleventh Circuit, addressing the meaning of the term "willfully" as used in 42 USC 1320a-7b and citing *Bryan v United States*, 524 US 184; 118 S Ct 1939; 141 L Ed 2d 197 (1998), stated that a defendant acts "willfully" when he or she acts with knowledge that the pertinent conduct is unlawful or with an intent to do something that the law forbids.

As can be gleaned from comparing 42 USC 1320a-7b(a)(1) to MCL 400.607(1) and MCL 400.602(f) under the caselaw interpreting those provisions, federal law does not permit a conviction for filing a false Medicaid claim seeking payment for services allegedly rendered where a defendant lacked actual knowledge that the claim being filed was false or acted without intent to commit Medicaid fraud; constructive knowledge would not suffice.

Against this backdrop, we now tackle the arguments presented by defendants. Defendants contend that because there exists a difference between Michigan and federal law with respect to the elements necessary to obtain a conviction of Medicaid fraud, which results in state law standing as an obstacle to the accomplishment and execution of congressional objectives, the doctrine of federal preemption demands reversal of defendants' state-law convictions. Defendants assert that the MFCA imposes a lower *mens rea* requirement for criminal

culpability in Medicaid fraud cases that effectively nullifies the heightened *mens rea* requirement contained in 42 USC 1320a-7b(a)(1). Defendants also maintain that the pervasive nature of the federal government's involvement in the Medicaid program and its dominance in this field bar state governments from enacting a penal statute that creates a Medicaid crime for certain conduct that would not constitute a crime under federal law.

In *Ryan, supra* at 27-28, our Supreme Court set forth the following principles that govern preemption analysis:

> The doctrine of federal preemption has its origin in the Supremacy Clause of article VI, cl 2, of the United States Constitution, which declares that the laws of the United States "shall be the supreme Law of the Land . . . ." Where the principles of federal preemption apply, state courts are deprived of subject matter jurisdiction. Congressional intent is the cornerstone of preemption analysis. *People v Hegedus,* 432 Mich 598, 607; 443 NW2d 127 (1989).
>
> Federal provisions that invalidate state law must be narrowly tailored to support a presumption against preemption of state law. *Medtronic, Inc v Lohr,* 518 US 470, [485]; 116 S Ct 2240, 2250; 135 L Ed 2d 700 (1996). State police powers are not to be superseded unless that is the clear and unequivocal intent of Congress. *Cipollone v Liggett Group, Inc,* 505 US 504, 516; 112 S Ct 2608; 120 L Ed 2d 407 (1992). This is especially true where state regulation of matters relating to health and safety are involved. *Hillsborough Co v Automated Medical Labs Inc,* 471 US 707, 715; 105 S Ct 2371; 85 L Ed 2d 714 (1985).

> \*   \*   \*

> Federal preemption is either express or implied. If express, the intent of Congress to preempt state law must be clearly stated in the statute's language or impliedly contained in the statute's structure and purpose. *Cipol-*

*lone, supra* at 516. In the absence of express preemption, implied preemption may exist in the form of conflict or field preemption. Conflict preemption acts to preempt state law to the extent that it is in direct conflict with federal law or with the purposes and objectives of Congress. Field preemption acts to preempt state law where federal law so thoroughly occupies a legislative field that it is reasonable to infer that Congress did not intend for states to supplement it. *Cipollone, supra* at 516. However, as seven members of the *Cipollone* Court agreed, when "Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority' . . . 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation." *Id.* at 517, quoting *California Federal Savings & Loan Ass'n v Guerra*, 479 US 272, 282; 107 S Ct 683; 93 L Ed 2d 613 (1987).[5]

For purposes of our discussion regarding preemption, it is helpful to first examine the nature and characteristics of the Medicaid program, which also necessarily touches on defendants' argument of implicit field preemption. The federal Medicaid program or act, Title XIX of the Social Security Act, 42 USC 1396 *et seq.*, was

---

[5] In *LaVene v Winnebago Industries*, 266 Mich App 470, 478; 702 NW2d 652 (2005), this Court summarized the rules of federal preemption in short fashion:

Preemption occurs only under certain conditions: (1) when a federal statute contains a clear preemption provision; (2) when there is outright or actual conflict between federal and state law; (3) where compliance with both federal and state law is in effect physically impossible; (4) where there is implicit in federal law a barrier to state regulation; (5) where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement federal law; or (6) where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. [Citation omitted.]

established in 1965 by Congress as part of a cooperative federal-state program pursuant to which the federal government reimburses the states for a portion of the cost of providing medical care to needy individuals. *Nat'l Bank of Detroit v Dep't of Social Services*, 240 Mich App 348, 354; 614 NW2d 655 (2000), quoting *Cook v Dep't of Social Services*, 225 Mich App 318, 320-323; 570 NW2d 684 (1997).[6]

In *Wilder v Virginia Hosp Ass'n*, 496 US 498, 502; 110 S Ct 2510; 110 L Ed 2d 455 (1990), the United States Supreme Court explained:

> Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals. § 1396. Although participation in the program is voluntary, participating States must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services (Secretary). To qualify for federal assistance, a State must submit to the Secretary and have approved a "plan for medical assistance," § 1396a(a), that contains a comprehensive statement describing the nature and scope of the State's Medicaid program. 42 CFR § 430.10 (1989). The state plan is required to establish, among other things,

---

[6] 42 USC 1396 provides:

For the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance.

a scheme for reimbursing health care providers for the
medical services provided to needy individuals.

A state's Medicaid plan must provide for a certain level
of financial participation by the state. 42 USC
1396a(a)(2).

The entire structure of Title XIX of the Social Secu-
rity Act reflects the implementation of a program to
provide health care to the poor of this country premised
on a collaborative effort between the federal govern-
ment and state governments. The Medicaid act "is
designed to advance cooperative federalism," and where
a degree of latitude is consistent with the aims of the
act, the United States Supreme Court has "not been
reluctant to leave a range of permissible choices to the
States[.]" *Wisconsin Dep't of Health & Family Services
v Blumer*, 534 US 473, 495; 122 S Ct 962; 151 L Ed 2d
935 (2002).

In *New York State Dep't of Social Services v Dublino*,
413 US 405; 93 S Ct 2507; 37 L Ed 2d 688 (1973), the
United States Supreme Court addressed the issue
whether the Federal Work Incentive Program (WIN),
which was part of the Social Security Act, preempted
the provisions of the New York Social Welfare Law that
required individuals to accept employment as a condi-
tion for receiving federally funded aid to families with
dependent children (AFDC program) under WIN. The
Court held that WIN did not preempt New York law. *Id.*
at 412. Like the description of the Medicaid program
stated above, the Supreme Court noted that the AFDC
program was best described as a scheme of cooperative
federalism. *Id.* at 413. Under the AFDC program,
comparable to the Medicaid program, states had consid-
erable latitude in allocating AFDC resources because
each state could set its own standard of need and
determine the level of benefits to be devoted to the

program. *Id.* at 414. The Supreme Court recognized the legitimate concern "of the state government to deal effectively with the critical problem of mounting welfare costs . . . ." *Id.* at 413. Because the Medicaid program in Michigan is funded, in part, by the state, it is financially essential that the state be able to prosecute persons who are fraudulently billing for services and accepting Medicaid payments. Similar to defendants' argument here, the appellees in *Dublino* argued to the high court that Congress intended to preempt state programs because of the sweeping and comprehensive nature of WIN. The Court rejected the argument, ruling:

> We reject, to begin with, the contention that preemption is to be inferred merely from the comprehensive character of the federal work incentive provisions. The subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem. Given the complexity of the matter addressed by Congress in WIN, a detailed statutory scheme was both likely and appropriate, completely apart from any questions of pre-emptive intent. This would be especially the case when the federal work incentive provisions had to be sufficiently comprehensive to authorize and govern programs in States which had no welfare work requirements of their own as well as cooperatively in States with such requirements. [*Id.* at 415 (citations omitted).]

Furthermore, in *Pharmaceutical Research & Manufacturers of America v Meadows*, 304 F3d 1197, 1206 (CA 11, 2002), the United States Court of Appeals for the Eleventh Circuit stated that "Medicaid is a cooperative state-federal program, in which each participating state designs and implements its own Medicaid program subject to certain strictures established by federal law[,]" and thus implied field preemption is inappli-

cable. The Court noted that "the federal government cannot 'occupy the field' when no Medicaid relief is available unless a state designs and implements its own Medicaid program." *Id.*

Consistent with the caselaw, and as evident from the federal statutory scheme, Medicaid is a program that uses a form of cooperative federalism under which coordinated state and federal efforts coexist within a complementary framework in regard to administration. And this collaborative effort is further shown by Michigan's Social Welfare Act, MCL 400.1 *et seq.*, and the various provisions pertaining to Medicaid.[7] Although Title XIX is replete with intricate and complex conditions and rules that are imposed on states in order for states to participate in the Medicaid program and to receive federal funds, the states are not left with an absence of power and authority to set parameters and controls relative to Medicaid, as evidenced by Title XIX and our own Social Welfare Act, nor does the detailed federal statutory scheme dictate a finding of federal preemption on every matter arising out of the Medicaid program. Moreover, Title XI of the Social Security Act, 42 USC 1301 *et seq.*, which encompasses 42 USC 1320a-7b, does not contain any provision suggesting that Congress intended to solely dominate and control the field of criminal prosecutions for Medicaid fraud under 42 USC 1320a-7b. Any argument based on implicit field preemption must fail.

Defendants also rely on the theory of implied conflict preemption and on the theory that MCL 400.607(1) and

[7] For example, MCL 400.105(1) provides that "[t]he state department shall establish a program for medical assistance for the medically indigent under title XIX. The director of the state department shall administer the program established by the state department and shall be responsible for determining eligibility under this act."

MCL 400.602(f) stand as an obstacle to the execution and accomplishment of the full objectives of Congress. Taking into consideration solely the language of MCL 400.607(1), MCL 400.602(f), and 42 USC 1320a-7b(a)(1), it is arguable that there exists at least a partial conflict between MCL 400.607(1), as refined by the definition of "knowing" in MCL 400.602(f), and 42 USC 1320a-7b(a)(1), where Michigan law allows a conviction for filing a false Medicaid claim based on constructive knowledge, while federal law does not. Again, contemplating only the above statutes, one could argue that the purpose and objective of Congress in enacting 42 USC 1320a-7b(a)(1), wherein the terms "knowingly and willfully" are used, was to penalize only those persons who were intentionally engaging in Medicaid fraud. Although defendants' argument and these issues pertain to the theory of implicit conflict preemption, they also require us to first examine the express language used by the United States Congress in 42 USC 1320a-7b and throughout Title XIX.

As indicated above, the federal statute, 42 USC 1320a-7b, contains no express language indicating a specific intent and deliberate effort by Congress to preempt state law in regard to criminal prosecutions for Medicaid fraud, nor does Title XIX of the Social Security Act, and defendants do not appear to make a claim of express preemption. On the other hand, 42 USC 1320a-7b does not contain any express language suggesting that a defendant can also be prosecuted under state laws. However, Title XIX makes this suggestion. And the fatal defect in defendants' argument espousing the theory of implicit conflict preemption is ultimately the fact that Title XIX contains express provisions indicating that Congress envisioned and does permit prosecutions under state law for Medicaid fraud. Given

that congressional intent is the touchtone of any preemption analysis, the express language used by Congress must govern.

42 USC 1396b(q) defines the term "State medicaid fraud control unit," and sets forth numerous criteria that must be satisfied for an entity to qualify as such a unit. An entity can potentially qualify if the entity "is a unit of the office of the State Attorney General or of another department of State government which possesses statewide authority to prosecute individuals for criminal violations . . . ." 42 USC 1396b(q)(1). Obviously, if a state attorney general has authority to prosecute persons engaged in Medicaid fraud, this authority would generally entail prosecutions in state court and under state law. Even more enlightening is 42 USC 1396b(q)(3), which provides the following requirement for an entity to be designated a state Medicaid fraud control unit:

> The entity's function is conducting a statewide program for the investigation and prosecution of violations of all *applicable State laws* regarding any and all aspects of fraud in connection with (A) any aspect of the provision of medical assistance and the activities of providers of such assistance under the State plan under this subchapter; and (B) upon the approval of the Inspector General of the relevant Federal agency, any aspect of the provision of health care services and activities of providers of such services under any Federal health care program (as defined in section 1320a-7b(f)(1) of this title), if the suspected fraud or violation of law in such case or investigation is primarily related to the State plan under this subchapter. [Emphasis added.]

Thus, Congress clearly and expressly contemplated state Medicaid fraud prosecutions in certain situations and under applicable state laws; there is no language indicating that the applicable state law must be entirely

consistent with the federal law.[8] Michigan indeed has a Medicaid fraud control unit as evidenced by MCL 400.610b, which provides:

> (1) The attorney general may recover all costs this state incurs in the litigation and recovery of medicaid restitution under this act, including the cost of investigation and attorney fees. The attorney general shall retain the amount received for activities under this act, excluding amounts for restitution, court costs, and fines, not to exceed the amount of this state's funding match for *the medicaid fraud control unit*.

> \* \* \*

> (3) Costs that the attorney general recovers in excess of the state's funding match for the *medicaid fraud control unit* shall be deposited in the Michigan medicaid benefits trust fund . . . . [Emphasis added.]

Here, the Medicaid fraud control unit of the Michigan Attorney General's Office prosecuted the case. We note that 42 USC 1396b(q)(3) speaks of prosecutions relative to Medicaid assistance provided pursuant to "the State plan under this subchapter." Dental services for adults are an optional coverage under Medicaid and, as a result, states are not obligated to provide such services at all. See 42 USC 1396d; 42 CFR 440.210, 440.220, and 440.225; *Callen v Rogers*, 216 Ariz 499, 503-504; 168 P3d 907 (Ariz App, 2007); *Cushion v Dep't of PATH*, 174 Vt 475, 477; 807 A2d 425 (2002), citing 42 USC 1396d(a)(10). Michigan, however, has elected or opted to provide dental services for the needy under its

---

[8] We also note 42 CFR 1007.11(a), which provides that "[t]he unit will conduct a Statewide program for investigating and prosecuting (or referring for prosecution) violations of all applicable State laws pertaining to fraud in the administration of the Medicaid program, the provision of medical assistance, or the activities of providers of medical assistance under the State Medicaid plan."

Medicaid program. See MCL 400.108 and MCL 400.109. Accordingly, we can confidently conclude that the prosecution in this case was related or primarily related to the Michigan Medicaid plan. 42 USC 1396b(q)(3) generally shows a congressional intent to allow prosecutions under state law, and this position is reinforced by 42 USC 1396h, which provides, in pertinent part:

(a) In general

Notwithstanding section 1396d(b) of this title, if a State has in effect a law relating to false or fraudulent claims that meets the requirements of subsection (b), the Federal medical assistance percentage with respect to any amounts recovered under a State action brought under such law, shall be decreased by 10 percentage points.

Subsection b of 42 USC 1396h details the requirements, none of which mandates consistency with 42 USC 1320a-7b, and the substance of those requirements is unimportant for purposes of our analysis. This is because satisfaction of the requirements only affects the percentage of any restitution or civil recovery by the state to be given to the federal government; the state is allowed an increased share of any recovery. Therefore, any other state action or prosecution under state law against a fraudulent claimant that falls outside the requirements of subsection b is still permissible; however, the state is merely awarded a smaller share of the recovery. The main point relevant to this panel that emanates from 42 USC 1396h is that Congress clearly contemplated state prosecutions under applicable state law.

Furthermore, 42 USC 1320a-7 provides, in relevant part:

(a) Mandatory exclusion

The Secretary shall exclude the following individuals and entities from participation in any Federal health care program (as defined in section 1320a-7b(f) of this title):

* * *

(3) Felony conviction relating to health care fraud

Any individual or entity that has been convicted for an offense which occurred after August 21, 1996, *under Federal or State law,* in connection with the delivery of a health care item or service or with respect to any act or omission in a health care program . . . operated by or financed in whole or in part by any Federal, State, or local government agency, of a criminal offense consisting of a felony relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct. [Emphasis added.]

Again, Congress clearly contemplated prosecutions for Medicaid fraud under applicable state law.

In sum, we hold that MCL 400.607(1) is not preempted by 42 USC 1320a-7b because there is no evidence of a congressional intent, under either express or implied theories, to preempt the MFCA; rather, express language in Title XIX indicates an intent by Congress to allow state-law prosecutions for Medicaid fraud.[9]

### B. SUFFICIENCY OF THE EVIDENCE

Defendants argue that there was insufficient evidence to show that the Medicaid claims made by defendants were false and, assuming the claims were false, there was a lack of sufficient evidence to show that defendants had knowledge that the claims were false. On the issue of falsity, defendants complain that the trial court, in determining whether there existed proof of guilt beyond a reasonable doubt, accepted the opinion of the prosecutor's expert, which was based on subjective determinations, instead of the opinion of defen-

---

[9] We see no reason to discuss the Florida cases cited by defendants because we find them unpersuasive, especially given their failure to address or even recognize provisions in Title XIX that reflect a congressional intent to allow state-law prosecutions.

dants' equally competent expert. Defendants maintain that both experts indicated that the identification of the various tooth surfaces relative to the fillings or restorations was subject to differing interpretations and reflected differences that could be as slight as a fraction of a millimeter. According to defendants, criminal liability cannot be incurred where dental practitioners have reasonable differences of opinion concerning the determination of the number of tooth surfaces that were restored, and due process would be offended if the convictions were allowed to stand. Defendants further contend that the trial court ignored the testimony of defendants' office staff, who all agreed that Kanaan would never intentionally submit a false claim and that billing mistakes often occurred. Defendants also argue that there was not even a scintilla of evidence to suggest that defendants possessed the requisite knowledge as defined in MCL 400.602(f). Defendants maintain that there was no systemic or persistent tendency to cause inaccuracies, given that this case involved only 11 allegedly inaccurate claims for three patients that spanned over a year in a dental practice that, in an average week, treated 100 patients and performed 400 procedures. Defendants vigorously argue that there was no objective proof of the alleged errors and defendants' knowledge of the errors.

We review claims of insufficient evidence de novo. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). When ascertaining whether sufficient evidence was presented in a bench trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Wilkens*, 267 Mich App 728, 738; 705

NW2d 728 (2005).[10] This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992); see also MCR 6.001(D); MCR 2.613(C). Circumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime. *Carines, supra* at 757. All conflicts in the evidence must be resolved in favor of the prosecution. *People v Terry,* 224 Mich App 447, 452; 569 NW2d 641 (1997).

In order to convict a defendant under MCL 400.607(1), the prosecutor must prove "(1) the existence of a claim, (2) that the accused makes, presents, or causes to be made or presented to the state or its agent, (3) the claim is made under the Social Welfare Act, 1939 PA 280, MCL 400.1 *et seq.*; MSA 16.401 *et seq.*, (4) the claim is false, fictitious, or fraudulent, and (5) the accused knows the claim is false, fictitious, or fraudulent." *People v Orzame*, 224 Mich App 551, 558; 570 NW2d 118 (1997), citing *In re Wayne Co Prosecutor*, 121 Mich App 798, 801-802; 329 NW2d 510 (1982). Elements 4 and 5 are at issue here, and the statutory definition of "false" is "wholly or partially untrue or deceptive." MCL 400.602(d). And the term "deceptive" is statutorily defined as "making a claim or causing a claim to be made under the social welfare act, Act No. 280 of the Public Acts of 1939, which contains a

---

[10] MCR 6.403 provides:

When trial by jury has been waived, the court with jurisdiction must proceed with the trial. The court must find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment. The court must state its findings and conclusions on the record or in a written opinion made a part of the record.

statement of fact or which fails to reveal a material fact, which statement or failure leads the department to believe the represented or suggested state of affair to be other than it actually is." MCL 400.602(c). As indicated in our discussion of preemption, the terms "knowing" and "knowingly" are statutorily defined as encompassing the following situations:

> [A] person is in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a medicaid benefit. Knowing or knowingly does not include conduct which is an error or mistake unless the person's course of conduct indicates a systematic or persistent tendency to cause inaccuracies to be present. [MCL 400.602(f).]

We first rule that the trial court's decision to accept the opinion of the prosecutor's expert, Dr. Haupt, over defendants' expert, Dr. Aksu, relates to the issue of credibility, and we are not permitted to interfere with the trier of fact's role of determining the credibility of the witnesses. *Wolfe, supra* at 514-515; see also MCR 6.001(D); MCR 2.613(C) ("regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it"). Moreover, "a trier of fact is not bound to accept the opinion of an expert." *People v Clark*, 172 Mich App 1, 9; 432 NW2d 173 (1988). Furthermore, the trial court had a sound basis to find Haupt more credible and reliable, given that Haupt personally examined the teeth of the patients at issue, along with reviewing photographs and x-rays, whereas Aksu did not conduct personal examinations. Aksu primarily relied on photographs for his opinions, which was somewhat problematic in regard to identifying tooth surfaces. The record indicates that Haupt engaged in an exhaustive examination of materials related to the patients' teeth, as well

as observed the teeth firsthand. Additionally, with regard to the weight of the evidence, it was for the trial court, not this Court, to assess the weight to be given to Haupt's testimony, and we defer to the court, sitting as the trier of fact in the bench trial, relative to its finding that Haupt's testimony established proof of guilt beyond a reasonable doubt. *Wolfe, supra* at 514-515. In the same vein, we defer to the trial court's decision not to give much, if any, weight to the testimony by defendants' office staff that Kanaan would never intentionally file a false claim. *Id.* We are unaware of any authority, nor do defendants cite any authority, that precludes a conviction where the prosecution relies on expert opinion to establish the elements of a crime.

The fact that we defer to the trial court with respect to assessing the credibility of the experts and determining the weight of the evidence defeats, in great part, defendants' argument regarding the sufficiency of the evidence. The trial court was entitled to consider and accept Haupt's testimony that the Medicaid claims filed by defendants were indeed false. Haupt's testimony established that the number of tooth surfaces claimed to have been restored or filled was inconsistent with the number of surfaces actually restored. Haupt never stated that his conclusions regarding the number of tooth surfaces restored or filled by Kanaan would be subject to reasonable dispute in the dental community. Indeed, Haupt was quite adamant and confident, not hesitant or uncommitted, with respect to his view that the tooth surfaces at issue were not restored. He further testified that he gave Kanaan the benefit of the doubt in regard to surface restorations that were a "close call" and that those restorations were thus not included in the charges brought by the prosecution. Haupt's testimony was sufficient, when viewed in a light most favorable to the prosecution, to show that the

Medicaid claims filed by defendants were false, untrue, deceptive, and reflected misrepresentations. MCL 400.602(c) and (d). We acknowledge Haupt's testimony that the practice of dentistry, including matters regarding identification of tooth surfaces, can involve "fractions of millimeters." But this is not a basis for reversing the convictions; rather, it reflects the reality and the nature of dentistry, and points to the fact that the extensive educational background of dentists is certainly designed to give dentists the ability to recognize the existence and importance of "fractions of millimeters" when providing dental services to their patients. Again, on surface restorations that constituted a close call, Haupt gave Kanaan the benefit of the doubt.

With regard to the argument concerning knowledge, because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented. *People v Fennell*, 260 Mich App 261, 270-271; 677 NW2d 66 (2004); *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999); *People v Reigle*, 223 Mich App 34, 39; 566 NW2d 21 (1997).

Paulette Carter, the office manager, testified that Kanaan was intimately involved in the billing process. According to Carter, Kanaan performed dental work according to a treatment plan and would then mark his initials on the chart next to the number indicating the treated tooth. Once treatment information was entered into the computer for billing purposes using various codes corresponding to the tooth number, Carter would check the form or chart against the computer screen to confirm billing accuracy, and Carter, as well as Kanaan, would review the patient's chart and compare it with

the billing or claim form actually generated by the computer. Carter's testimony was not contradicted, and, further, it was supported by the testimony of Tasha Rieves, defendants' dental billing specialist during the period in question, who testified that Kanaan handwrote a treatment plan and noted on the patients' charts when the work had been performed before the charts were turned over to her for entry into the billing system. Thus, no claims would have been submitted for billing to Medicaid without Kanaan's express approval and acknowledgment that the work had been performed. Considering this evidence in conjunction with Haupt's testimony that the number of tooth surfaces restored or filled was falsely identified in the claims for Medicaid reimbursement, there was sufficient evidence, when viewing it in a light most favorable to the prosecution, showing that defendants had actual or constructive knowledge that the claims were false. MCL 400.607(1); MCL 400.602(f); *Perez-DeLeon, supra* at 48-50.

### III. CONCLUSION

We hold that MCL 400.607(1) is not preempted by 42 USC 1320a-7b because there is no evidence of a congressional intent, under either express or implied theories, to preempt the MFCA; rather, express language in Title XIX indicates an intent by Congress to allow prosecutions under state law for Medicaid fraud.

Further, we hold that there was sufficient evidence, when viewing the evidence in a light most favorable to the prosecution, to show that the Medicaid claims filed by defendants were false and that defendants had actual or constructive knowledge that the claims were false.

Affirmed.