# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEREK JAMES SMITH,

        Defendant-Appellant.

UNPUBLISHED
November 22, 2016

No. 328477
Wayne Circuit Court
LC No. 15-001476-FC

Before: WILDER, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions on two counts of assault with intent to cause great bodily harm less than murder (assault GBH), MCL 750.84, three counts of assault with a dangerous weapon (felonious assault), MCL 750.82, one count of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, one count of possession of a firearm by a felon, MCL 750.224f, and two counts of assault and battery, MCL 750.81. We affirm the convictions, but remand for resentencing.

## I. FACTS

Defendant and his wife were evicted from a rental home in December 2014. Daniel Gabriel, the property's manager, was at the property in February 2015 because he received word that defendant and his wife had moved out and that a door was open. Gabriel was accompanied by John Slimmen and Bradley Hughey, two men who do repairs for Gabriel. According to Gabriel, as the three men were discussing whether and how to secure the door, defendant arrived. Gabriel testified that defendant ran up to him and began pushing him and telling him that he had not yet moved out of the home. Slimmen testified that he retrieved his phone from his truck to video record the altercation but, as he attempted to record it, defendant charged at him and slapped the phone out of his hand. Slimmen said that as he was trying to find his phone in the snow, defendant "came up and sucker punched [him] from behind." Slimmen said he escaped from defendant and found a pipe to defend himself with. Slimmen then observed defendant "running towards the car he pulled up in. And he was screaming for the driver to open the trunk." Slimmen said "there was no way I was going to allow him to get in the trunk" as it may have contained a gun or knife, and indicated that he chased defendant away from the trunk with the pipe in his hand. Slimmen testified that defendant "headed south . . . on Greensboro" and stopped at the corner of Greensboro and Elmdale and said "he was going to get a gun."

-1-

Gabriel, Slimmen, and Hughey left the location, traveling south on Greensboro in separate vehicles. As Gabriel started to turn right onto Elmdale, he saw defendant running toward him, so Gabriel decided to turn back. As he was doing so, Gabriel saw defendant "raise[] up his hand with a gun" and fire two shots at Gabriel. According to Gabriel, he heard at least four more shots as he continued south on Greensboro.

Hughey was traveling in a van behind Gabriel and observed defendant and "a buddy" as Hughey approached the intersection of Greensboro and Elmdale. Hughey testified that defendant "started shooting the gun." Hughey explained that he saw defendant "pointing [the gun] at the van" when Hughey passed him. When he was asked whether defendant was shooting at the van, Hughey answered, "Yes ma'am. But he—I don't think he was shooting at the van, no. He didn't hit the van." Hughey said that he heard three or four shots.

Slimmen testified to observing defendant walking toward him on Elmdale. Slimmen stated that he then saw defendant pull a gun "[a]nd point it at the truck." Slimmen decided to turn toward defendant in the hope he could deter defendant or, if necessary, "run him down." Instead, however, Slimmen got stuck in a snowbank. Slimmen testified that defendant then came "racing up" and opened the passenger door of Slimmen's vehicle. Slimmen was able to get the vehicle out of the snowbank and, as he was driving away, he "hear[d] [his] truck getting hit. It sounded like somebody was stoning my truck."

According to Gabriel and Slimmen, the three men met up and inspected their vehicles. Gabriel said neither he nor Hughey found bullet holes in their vehicles, but that Slimmen found one in his passenger door. Slimmen indicated that a subsequent inspection revealed "another bullet hole . . . in the back of the truck."

Defendant acknowledged arguing with Gabriel and pushing him, "smack[ing]" Slimmen's phone out of his hand, and hitting Slimmen. However, he explained that he ran from the scene to his new nearby home because he was threatened by Hughey. Defendant said that he met up with his cousin and asked him to meet defendant "around the corner," because defendant needed help removing items from the rental home. Defendant's description of what happened as he was returning to the rental home is as follows:

> As I approach like the middle of Elmdale, . . . my cousin is on the corner. I hear the gunshots. I hear two shots. When I heard that I fall backwards and I lays down on the grounds. And . . . after the shots come out, I hear them whistle past me, two shots. Just like that. . . .

According to defendant, he started to run but he saw Slimmen's vehicle "go into the bank." "I opened up the door to see if he was hit," defendant stated, "[a]nd when he looked back, he still had the pole in his hand and he was going like to hit me with it." Defendant said that he "just shut the door" and ran. Defendant denied having a weapon in his possession and that he shot at anyone.

## II. ANALYSIS

### A. DIRECTED VERDICT

Defendant first argues that the trial court erred in denying his motion for a directed verdict on three counts of assault with intent to murder. But he was not convicted of those charges. Nonetheless, defendant argues that he was prejudiced by the denial of his motion because the jury may have reached a compromised verdict. However, even if we were to agree that those charges were improperly submitted to the jury, prejudice is not assumed. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). That is, reversal may only be warranted when there is "sufficiently persuasive indicia of jury compromise," *id*. at 487, and, here, defendant merely speculates that the jury may have reached a compromise verdict—despite the instructions that were given to the jury. See *id*. at 486. Accordingly, this claim is without merit.

### B. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that there was insufficient evidence presented to support his two assault GBH convictions. The victims of these two assaults are Gabriel and Slimmen. The elements of the crime are: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (internal quotation marks and citation omitted). Defendant argues that insufficient evidence was adduced to support a finding that he had the specific intent to cause great bodily harm to either Gabriel or Slimmen.

"Claims of insufficient evidence are reviewed de novo." *People v Kloosterman*, 296 Mich App 636, 639; 823 NW2d 134 (2012). "A court reviewing the sufficiency of the evidence must view the evidence in the light most favorable to the prosecution and determine whether the evidence was sufficient to allow any rational trier of fact to find guilt beyond a reasonable doubt." *Id*. "All conflicts in the evidence must be resolved in favor of the prosecution." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

"Intent to do great bodily harm is intent to do serious injury of an aggravated nature." *People v Russel*, 297 Mich App 707, 721; 825 NW2d 623 (2012). "Intent to cause serious harm can be inferred from the defendant's actions, including the use of a dangerous weapon or the making of threats." *People v Stevens*, 306 Mich App 620, 629; 858 NW2d 98 (2014). "[A]ctual injury to the victim is not an element of the crime . . . ." *Id*. "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as . . . intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind . . . ." *Kanaan*, 278 Mich App at 622.

Defendant suggests the fact that Gabriel's and Hughey's vehicles were "not struck" by a bullet shows that he did not have the requisite intent. That the gunshots fired missed Gabriel's truck does not preclude a rational jury from inferring that defendant intended to cause Gabriel great bodily harm; Gabriel could simply have been lucky that he was not shot. Also, Gabriel said that defendant was "running back towards me" before the shooting. If defendant did not intend to shoot Gabriel, and was intentionally aiming high or low as defendant suggests, then he would have no motive to close the gap to Gabriel before shooting. If he intended to cause

Gabriel great bodily harm, however, then it is reasonable to conclude he was running toward Gabriel because he wanted to shoot from a closer range. And testimony established that defendant was very upset and physically confrontational with Gabriel prior to the shooting.

As for Slimmen, defendant argues that "when [he] attempted to enter the truck, without having his gun ready to shoot Mr. Slimmen, it is difficult to believe that he had . . . specific intent" to cause great bodily harm less than murder. However, assuming defendant was not ready to shoot, it is possible to conclude from the evidence that defendant thought Slimmen had been shot when he opened the passenger door to the truck. When asked by the trial court why he opened Slimmen's door, defendant answered, "I didn't know if he got hit, because it went through his car. But I heard it hit his car." This testimony also undermines defendant's assertion on appeal that the bullet holes in Slimmen's truck "plainly occurred when the vehicle was driving away."

Even if the jury did not find that defendant intended to cause Slimmen great bodily harm less than murder before the truck drove out of the snowbank, it could have found that he formed such an intent at that point, as evidenced by defendant firing at Slimmen as he was driving away.

Defendant also engaged in a physical altercation with Slimmen because Slimmen appeared to be recording defendant on his phone. And there was testimony that, after being chased away by a pipe-wielding Slimmen, defendant indicated that he would return with a gun. A "live round" was found on the porch of defendant's nearby residence, which can be viewed as evidence of defendant manipulating a loaded gun at the residence before returning to the rental home.

In summary, defendant's assault GBH convictions are supported by sufficient evidence.

## C. SENTENCING

Defendant next argues that offense variables (OVs) 16 and 19 were incorrectly scored. We agree.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (footnotes omitted).

OV 16 addresses property damage. MCL 777.46(1). The variable applies to the offense categories of crimes against property, MCL 777.22(2), crimes against public order or public trust, MCL 777.22(4), and crimes against public safety, MCL 777.22(5). It only applies to crimes against a person for a home invasion or an attempted home invasion in violation of MCL 750.110a. MCL 777.22(1); *People v Kimble*, 470 Mich 305, 312; 684 NW2d 669 (2004). In this case, as argued by defense counsel during sentencing, defendant was not charged with a property offense, although the prosecution could have possibly charged defendant with "malicious destruction of property." Defendant was also not charged with a home invasion offense. Therefore, the trial court erred in assessing one point under OV 16.

OV 19 addresses interference with the administration of justice or the rendering of emergency services. MCL 777.49. The trial court assessed 15 points under OV 19 after concluding that defendant knocked the phone out of the hand of one of the victim's as he was attempting to videotape defendant's behavior that day with the purpose to interfere with the administration of justice. "[T]he only reason they would be trying to document [defendant's] behavior that day is for the purpose of justice as it relates to the - - not only the eviction proceedings, but even the assault that was going on . . . ." Further, the court noted, after knocking the phone out of the person's hand and into a snow pile, defendant then attacked the person who was trying to look for their phone and "he could have been trying to get his phone to call help or call for 9-1-1." Defense counsel objected to the scoring, arguing that defendant was not charged with that particular crime and there was no evidence of any of the victims threatening to call the police before defendant knocked the phone out of one of the victim's hands. That is, defendant could have knocked the phone out of the person's hand for any number of reasons, not merely to stop a call for assistance.

Under MCL 777.49(b), 15 points may be assessed when "[t]he offender used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice or the rendering of emergency services." However, as defendant argues on appeal, the events relating to the phone did not occur during, or even after, the sentencing offense of assault GBH. "Offense variables must be scored giving consideration to the sentencing offense alone, unless otherwise provided in the particular variable." *People v McGraw*, 484 Mich 120, 133; 771 NW2d 655 (2009) (footnote omitted). In *People v Smith*, 488 Mich 193; 793 NW2d 666 (2010), our Supreme Court held that "because the circumstances described in OV 19 expressly include events occurring *after* the completion of the sentencing offense, scoring OV 19 necessarily is not limited to consideration of the sentencing offense." *Id.* at 195 (emphasis added). However, the events relating to the phone neither occurred during nor after the completion of the sentencing offense of assault GBH; rather, they occurred well before defendant even announced that he was going to get a gun. Accordingly, it was plain error for the trial court to score OV 19 at 15 points.

Defendant was scored a total of 40 PRV points and 56 OV points, placing him in PRV Level D and OV Level V, with a minimum sentence range under the guidelines as a second habitual offender of 29 to 71 months. MCL 777.65; MCL 777.21(3)(a). If OV 16 is properly scored at zero points and OV 19 is properly scored at zero points, defendant's OV score would be reduced to 40 points, which is OV Level IV, and his minimum sentence range would be 19 to 47 months. See MCL 777.65; MCL 777.21(3)(a). Thus, defendant was prejudiced by the trial court's scoring errors and he is entitled to resentencing.

Further, in rendering defendant's sentence, the trial court indicated that its "practice" is to sentence a defendant "to the top of [the] guidelines" following a jury trial; thus, defendant was sentenced to 71 months to ten years for the offenses of assault GBH. On appeal, defendant argues that the trial court improperly penalized him for exercising his right to a jury trial and failed to render an individualized sentence. After review of these unpreserved issues for plain error affecting defendant's substantial rights, we agree. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Criminal defendants have a constitutional right to a jury trial, US Const, Am VI; Const 1963, art 1, § 20, which is violated if a defendant is penalized at sentencing for exercising his right. *People v Mosko*, 190 Mich App 204, 211; 475 NW2d 866 (1991). Further, "Michigan's Legislature has determined that the proper approach to sentencing is to favor individualized sentencing for every defendant." *People v Sabin (On Second Remand)*, 242 Mich App 656, 661; 620 NW2d 19 (2000); see also MCL 769.8. "Therefore, a trial court has been given broad discretion, within limits fixed by law, to tailor a sentence to the circumstances of each case and each offender . . . ." *Sabin (On Second Remand)*, 242 Mich App at 661. "Individualized sentencing furthers the goal of rehabilitation by respecting the inherent dignity of each person the law deprives of freedom, civil rights, or property." *People v Heller*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 326821); slip op at 3.

In this case, the trial court sentenced defendant pursuant to its "practice" of sentencing defendants "to the top of your guidelines" following a jury trial. According to the court, the purpose of its practice is "not to punish people for exercising their right to go to trial," but to "reward[] people who accept—who accept responsibility for their behavior and plead guilty in advance of trial." The distinction drawn by the trial court is unconvincing. The court's statement that its practice rewards defendants who plead guilty strongly implied that those defendants are not as a matter of routine sentenced to the high end of their minimum sentence range. Thus, had defendant pleaded guilty, he would have received a lesser sentence. The court may not have intended to punish defendant for exerting his Fifth Amendment rights, but the impact is the same regardless.

Further, "[a] sentence is invalid if the court conforms the sentence to a local sentencing policy rather than imposing an individualized sentence." *People v Catanzarite*, 211 Mich App 573, 583; 536 NW2d 570 (1995), citing *People v Chapa*, 407 Mich 309; 284 NW2d 340 (1979). In *Chapa*, the trial court sentenced the defendant to a minimum of eight years imprisonment for delivery of and conspiracy to deliver heroin. *Id*. at 310. The court held that a county program "concerning heroin" "removes much of the discretion that the court might otherwise have relative to sentences" and determined that it had an "obligation" to sentence defendant to prison. *Id*. The Michigan Supreme Court, guided by the principle that "[f]or most crimes, the policy is for individualized sentencing," held that "[t]he sentencing judge erred here in limiting his discretion in accordance with the stated local policy." *Id*. at 311. The Court remanded for resentencing on that basis. *Id*.

Similarly, in this case it is clear that the trial court sentenced defendant in accordance with its stated policy. Further, the trial court indicated that the imposed sentenced was a matter of chance when it told defendant after explaining its policy that "it just so happens that you came on here on that day because . . . our normal judge was busy. And I don't know what he normally does, but that's what I do." Thus, the trial court erred by failing to provide defendant with individualized sentencing.

It is not clear, however, "that the error affected the outcome of the lower court proceedings," *Carines*, 460 Mich at 763, as the court could have sentenced defendant to the high end of the range even if it was not adhering to a practice of doing so. But to take the court at its word, it is clear that the court did not consider anything about the circumstances of this defendant and this crime when imposing sentence. It simply followed a rote practice that, as

noted above, is based on whether a defendant exercised his or her constitutional right to a jury trial.

We affirm defendant's convictions, but vacate his sentence and remand for resentencing.[1]


/s/ Kurtis T. Wilder
/s/ Mark J. Cavanagh

---

[1] Sentencing is to be held before a different judge. We do not call into question the judge's impartiality. We simply believe that sentencing before a different judge involves a minimal waste or duplication of judicial resources and promotes the appearance of justice under the circumstances of this case. See *People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997).