# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

v

JAMAL ANTHONY MOORE,

          Defendant-Appellant.

UNPUBLISHED
January 27, 2015

No. 318674
Wayne Circuit Court
LC No. 13-000749-FC

Before: BECKERING, P.J., and JANSEN and BOONSTRA, JJ.

PER CURIAM.

Defendant, Jamal Anthony Moore, appeals as of right his bench trial convictions of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to 20 to 40 years' imprisonment for the second-degree murder conviction and two years' imprisonment for the felony-firearm conviction. We affirm.

## I. PERTINENT FACTS

This case arises from a death reported on Tuesday, August 21, 2012, in Detroit, Michigan. At the time of his death, the decedent, 17-year-old Carlos Wesley, was house sitting at the home of his uncle, Donald Wesley. Carlos was found at Donald's home early in the morning on August 21, 2012, with a single gunshot wound to the back of the head. A forensic pathologist ruled the death a homicide, but could not estimate a time of death.

Carlos's girlfriend, Shardae Herron, testified that defendant and Carlos visited her home on the evening of Sunday, August 19, 2012, at approximately 11:00 p.m. She believed that Carlos was carrying a revolver. Herron further stated that defendant discussed selling drugs and "killing people," although these details were not included in the statement that she gave to police. Shardae opined that defendant was acting erratically and that he was "looking a little like he was on something." When Carlos and defendant left, they walked toward of the home of Carlos's uncle, where Carlos was house sitting.

-1-

Defendant's mother, Sharlette White, testified that she asked defendant to leave her house in April 2012 because of unspecified behavioral problems. Defendant moved in with one of his mentors, James Thorpe, from April 2012 through August 2012, and from August 2012 until approximately January 2013, defendant was living with Leonard Gibson, another mentor. White testified that she still spoke with defendant after he moved out of her house. After learning of Carlos's death in August 2012, White called defendant and told him Carlos had died. Defendant started crying, saying, "Mommy, no." White did not discuss Carlos's death with defendant in more detail for a period of time after this.

White testified that, on November 2, 2012, she and her boyfriend, Tony Louie, drove to Gibson's house, where defendant was staying, because she wanted to speak with defendant. At this time, defendant confessed to killing Carlos. He told White, "I messed up[,]" and admitted, "I killed Carlos." He told White that he shot Carlos in the head with a revolver, and that, before he could think twice, "the revolver went off" and it was too late. Defendant told White that he and Carlos "were hitting licks, [i.e., robbing people] and Carlos was being greedy and that [defendant] saw a [text] message saying that if we get in trouble that he was going to pin it all on [defendant]." According to White, Louie told defendant, "this will stay in this car."

White did not report defendant's confession to police officers until January 2, 2013, when she spoke with Detective Bob Lalone of the Detroit Police Department. She signed a written statement at that time. White testified consistently with her written statement on January 4, 2013, pursuant to an investigative subpoena, and again during the preliminary examination on January 25, 2013. However, during cross-examination at the preliminary examination, White reported for the first time that Louie was present during defendant's confession to her. She explained that she did not tell police officers about Louie because she had ended her relationship with him and she did not want to involve him in the matter. At trial, Louie testified that he recalled going to see defendant at Gibson's house, but he did not recall defendant's confession. However, he admitted he suffered from memory loss because of a head injury and because he was an alcoholic.

While defendant was awaiting trial in the Wayne County Jail, he made several telephone calls to White and to other acquaintances. During the telephone calls, which were recorded and played for the trial court, defendant often discussed White's statement to police officers. In a January 29, 2013 conversation with defendant, White learned that defendant told police officers that White lied, prompting the following exchange:

> White. I'm gonna write you because I'm gonna have some questions to ask you and I need you to be real honest with those questions.
>
> Defendant. [Mumbling] . . . Just ask me now, 'cause they still gonna read them and stuff [inaudible].
>
> White. You told them that, y'all said that I lied?
>
> Defendant. Yeah.
>
> White. So you all lyin' on me to try to get me in trouble?

Defendant.  No.

White.  Because I just had to, [inaudible] like you said, they're going to read it, but I just had to know.

Defendant.  But all I'm saying is uh, [mumbling] the only reason why I was doing that, the only reason why I was treating you like that is 'cause you're the only problem witness and you [are] the only reason they have a case [inaudible.]

White.  I, I mean.

Defendant.  That's why, that's why I was treating you like that [mumbling, inaudible.]

White.  What do you expect?  They had me in handcuffs[1] for over two hours, Jamal!  I was handcuffed for over two hours.

\* \* \*

White.  They um, why did you say that you did it in the very beginning?

Defendant.  Stop talking about this!  Or speak in code, or something, 'cause they're going to record this.

\* \* \*

Defendant.  But, the only thing, my thing, my lawyer tells me that the only case they have against me is you, the witness.

In a telephone call recorded on March 9, 2013, defendant explained to White that he had a "loophole":

Defendant.  Um I talked to my lawyer a little bit.

White.  Ok.

Defendant.  Trying to give me the run down on my case.

White.  Which is?

---

[1] Although she relayed defendant's confession to the police, White did not want to testify against defendant because she felt she was not on her son's side.  Before White agreed to testify at the preliminary examination, the trial court judge held her in contempt of court and placed her, handcuffed, in lockup.  To ensure her appearance at trial, the prosecution subpoenaed White and placed her on a material witness tether.

-3-

Defendant.  Umm, well, he tells me, that basically, my loophole is to get [Louie] into the case.

White.  To get him in the case?

Defendant.  [Inaudible.]  To get him in the case so he can say what I said [inaudible].  So what he can say what supposedly I said, that what I said was not true or something.

White.  So they wanna find [Louie] and have him testify?

Defendant.  Yeah.

White.  Oh.  So, if they don't find [Louie] what happens?

Defendant.  I'm cooked.

White.  I'm sorry, I'm not understanding.

Defendant.  I'm cooked, 'cause they looking at it is, uh, [mumbling] they, they're looking at it like, why would somebody [sic] momma lie on them? And they looking at it, why would somebody, why would somebody tell their momma that anyway?

Later, during that same telephone call, defendant told White, "[m]y momma got the power of my freedom in her hands" and that her story was the "key" in his case.  At this suggestion, White became upset, touching off the following exchange with defendant:

White.  What did you look [sic] like saying doing [sic] the things you did, saying you do the things you did, Jamal.  Trying to make it look like I don't care. . . . Tell the lawyer the truth!"

Defendant.  I can't because . . .

White.  Yes you can.

Defendant.  Why can't you?  You said you were gonna do that but you never did.

* * *

White.  I said I would see what I could do.  See you always taking and turning my words around!

Just like I said I told ya'll that I lied.  Jamal, I never told you or Mr. Gibson at that jail that I lied to the police.  I never.  And you know that.

* * *

-4-

No. I never lied to them. I just didn't tell them there was somebody else in the car. But if that's what you want me to do, to tell them that there was somebody else in the car to really make you look bad, maybe I should have.

Defendant. Why would that make me look bad?

White. 'Cause that's two people against one.

\* \* \*

Defendant. I'm glad I know I got one person against me.

White. What do you mean by that?

Defendant. You just said it.

White. I don't, they, that's not saying I'm against you! You know what Jamal, I don't even want to talk to you no more because you pissing me off too.

Later, in an April 16, 2013 telephone call, defendant suggested that White "take[] back" her story:

White. Your lawyer talk to you [about] anything good or anything decent?

Defendant. Uh, nothin basically. He just tell me the same thing … If the witness … He just tell me.

White. Huh?

Defendant. He just telling me if the witness takes back the story then we be straight, but I don't know, I don't know.

During the same call, an individual referred to as "Snoop" joined the call, and asked defendant if his attorney told him anything about his case. The following exchange took place:

Defendant. He said if the witness take[s] back they, uh, if the witness take back they [sic] statement, the charges will be dropped.

Snoop. Who [is] the witness?

Defendant. My momma.

Snoop. What you gonna do about that?

White. I'm right here on the phone.

On July 9, 2013, White, at defendant's request, sent an anonymous letter to the prosecutor's office, defendant's attorney, and to the Detroit Police. The letter accused someone

-5-

named Michael Carter of killing Carlos. At trial, White explained that defendant told her what to write, and that she sent the letter because defendant claimed his trial counsel was not listening to him.

On August 7, 2013, in another recorded telephone call from jail, defendant began discussing his case with a friend named "Eric" and referenced the anonymous letter that White had sent. Eric began by asking defendant what his attorney told him about the case, to which defendant replied:

> He told me it's a 50/50 chance you know. Like I said, like I said. It's all, its all up to that person, but that person did something, just did something good for us on the low, ya know uh, this way better, it's better than that anonymous number. She, she actually sent an anonymous letter.

In his defense at trial, defendant presented Thorpe and Gibson as alibi witnesses who claimed that defendant was not with Carlos on Sunday August 19, 2012, or Monday August 20, 2012. Thorpe testified that defendant spent Sunday with him and stayed that night at his house. Gibson testified that defendant stayed with him on Monday and spent Monday night at his house. Gibson further testified that when he visited defendant in jail, he overheard White tell defendant that she lied to police about defendant's confession. According to Gibson, White explained that she lied so that she could prevent defendant from getting hurt on the streets. White denied Gibson's claims at trial. In addition, the prosecution played a telephone recording of a jail conversation between her and defendant in which she stated that she did not report defendant's confession because of a desire to have defendant taken off the street, telling defendant:

> Just know that I love you with all my heart, always have always will. Um, I didn't know what to do, still kinda confused with everything, ya know, and, and never, never did I do that to get you off the streets or whatever, I mean, you just, you just don't understand.

In rendering its verdict and making findings of fact, the trial court relied heavily on White's testimony in finding defendant guilty of second-degree murder and felony-firearm. The trial court opined that White's credibility was "the major issue in this case[,]" and explained several factors led it to the conclusion that White was credible. Notably, the trial court emphasized the fact that White had a "remarkable consistency" in her statements to police officers and in her testimony at various hearings. The trial court also found defendant's confession, as relayed by White, was credible, explaining:

> And then [defendant] went on to say the reason for shooting his best friend, and the reason was certainly a plausible one, that being that the defendant, Mr. Moore, and his best friend, Carlos Wesley, had been engaged in a series of robberies, and that Mr. Moore became concerned about number one, the fact he believed that Mr. Wesley was being in his words, stingy about sharing the proceeds of the robbery evenly.

> But then perhaps more importantly, according to Ms. White, the defendant, Mr. Moore, had discovered a text message on Mr. Wesley's cell

-6-

phone, where Mr. Wesley indicated that if Mr. Wesley was ever arrested for any of these robberies, he was going to put all of the blame on Mr. Moore.

The trial court also explained that "most importantly" it found insightful the telephone conversations between defendant and White when defendant was in jail:

> The testimony of the conversations dealt with the notion of Ms. White needing to "change her story."

> There was nothing in the phone exchanges, the conversations between Mr. Moore and his mother that talked about why are you lying on me? Why are you making this up? Why are you making up these false accusations against me that have me locked up in the Wayne County Jail[?]

> It's all about changing the story, and if your story is changed, then I wouldn't be caught. Certainly the testimony of Ms. White I thought was a credible version.

After finding White was credible, the trial court found that other witnesses—Louie and Gibson—lacked credibility. It found that Louie's testimony—that defendant did not confess during the November 2, 2012 conversation with White—lacked credibility because "Mr. Louie would not give a definitive answer if his life depended on it." Additionally, the trial court found that Gibson lacked credibility, explaining that his testimony was "equally incredible" when compared to Louie's and "not worthy of belief[,]" finding that White's testimony, as well as her comments on some of the recorded telephone calls, contradicted Gibson's testimony; therefore, because White's testimony was credible, Gibson's testimony was not credible.

## II. SUFFICIENCY OF THE EVIDENCE

The only issue defendant raises on appeal is that there was insufficient evidence to support his convictions. We disagree.

A challenge to the sufficiency of the evidence is reviewed de novo. *People v Harverson*, 291 Mich App 171, 175-176; 804 NW2d 757 (2010). This Court reviews the evidence in a light most favorable to the prosecution and determines whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Id*. at 175.

To establish second-degree murder, the prosecution must show: (1) a death, (2) caused by an act of the defendant, (3) malice, and (4) without lawful justification or excuse for the death. *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007). See also MCL 750.317. "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). Establishing felony-firearm requires: (1) that the defendant carried or possessed a firearm, (2) during the commission or attempted commission of a felony. *People v Johnson*, 293 Mich App 79, 83; 808 NW2d 815 (2011). See also MCL 750.227b.

When viewed in a light most favorable to the prosecution, there was sufficient evidence to support defendant's convictions beyond a reasonable doubt. Herron testified that defendant was with Carlos shortly before Carlos's murder. She also saw defendant and Carlos walking toward the house where Carlos's body was discovered. White testified that defendant confessed to killing Carlos with a revolver. As the trial court noted, White's testimony included motives for defendant to kill Carlos—that Carlos wanted to keep more of the proceeds for the robberies than defendant thought he was owed, and that defendant saw a text message stating that Carlos planned to blame defendant for the robberies if caught. This confession showed that defendant perpetrated the killing with malice, i.e., the intent to kill or cause great bodily harm, or the intent to do an act in wanton and willful disregard of the natural tendency of such behavior to cause death or great bodily harm, see *Goecke*, 457 Mich at 464, and without justification. White's testimony was corroborated, in part, by recorded telephone calls where defendant referred to her as "the witness" who needed to take back her statement. Defendant also referred to White as "the only problem witness" and "the only reason they have a case." And, as the trial court noted, White became incensed in telephone calls where defendant insinuated that she lied about defendant's confession. The trial court found White's testimony was credible, which is a conclusion that we will not disturb on appeal. It is the province of the trier of fact to assess the credibility of witnesses and to determine the weight of the evidence, and this Court will not interfere with the fact-finder's credibility determinations. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013); *People v Odom*, 276 Mich App 407, 419; 740 NW2d 557 (2007). See also *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002) ("It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences."). The trial court could fairly infer from the evidence noted above that the elements of second-degree murder and felony-firearm were proven beyond a reasonable doubt.

Defendant argues that he could not have killed Carlos because, according to Thorpe and Gibson, he was not with Carlos on Sunday, August 19, 2012, or Monday, August 20, 2012; Carlos's body was discovered in the early morning of Tuesday, August 21, 2012. Defendant's argument requires us to disregard the trial court's credibility determinations and to look at the evidence in a light most favorable to *defendant*. This argument ignores the standard with which we review claims of sufficiency of the evidence. See *Harverson*, 291 Mich App at 175 (explaining that this Court reviews the evidence in a light most favorable to the *prosecution*); *Odom*, 276 Mich App at 419 (explaining that this Court will not interfere with the fact-finder's credibility determinations). Although Thorpe and Gibson purported to provide an alibi for defendant, Herron testified that defendant was with Carlos shortly before Carlos's murder. It was wholly within the province of the trial court, in its role as the trier of fact, "to believe or disbelieve, in whole or in part, any of the evidence presented at trial." *People v Unger*, 278 Mich App 210, 228; 749 NW2d 272 (2008). And, the record reveals evidence to suggest that both Gibson and Thorpe lacked credibility. Both witnesses came forward with alibi testimony within the week before trial. Gibson failed to mention that he could provide an alibi for part of the relevant time when he met with an investigator for defendant's counsel five months earlier. Further, White's trial testimony and statements during one of the recorded telephone calls refuted Gibson's trial testimony. The evidence against defendant is not insufficient merely because the trial court relied on Herron and White instead of Gibson and Thorpe. See *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008) ("This Court will not interfere with the trier of fact's role in determining the weight of the evidence or the credibility of witnesses."). See also *People*

-8-

*v Crump*, 216 Mich App 210, 215; 549 NW2d 36 (1996) ("[T]his Court will rarely overturn a conviction when the only issue is the credibility of a witness.").

      Affirmed.

/s/ Jane M. Beckering
/s/ Kathleen Jansen
/s/ Mark T. Boonstra