# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
March 24, 2016

v

JAJUAN RICHARD WHITLOW,

Defendant-Appellant.

No. 324401
Macomb Circuit Court
LC No. 2013-002887-FC

Before: TALBOT, C.J., and WILDER and BECKERING, JJ.

PER CURIAM.

Defendant, Jajuan Whitlow, appeals as of right his jury trial conviction of second-degree murder, MCL 750.317. The trial court sentenced him to 13 to 30 years' imprisonment. We affirm.

Defendant, afflicted by mental disorders, was taken to the Behavioral Center of Michigan (BCM) after a psychotic episode. At BCM, defendant was placed in a room with Albert Potter. Within a few hours of his arrival at BCM, defendant was found in what appeared to be an attempt to suffocate Potter; he proceeded to beat Potter in the face approximately 10 to 15 times with his fists. Potter succumbed to his injuries several days following the attack.

Defendant first argues that because the prosecution failed to produce evidence rebutting his evidence of legal insanity, there was insufficient evidence supporting the jury's finding that defendant was not legally insane. We disagree.

This Court reviews de novo claims of insufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We view the evidence in "the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt." *Id.* Furthermore, "a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the . . . verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

Although conceptually anomalous, a defendant may challenge a jury's rejection of an insanity defense through an insufficiency of the evidence claim. See *People v McRunels*, 237 Mich App 168, 180-182; 603 NW2d 95 (1999). Ordinarily, a defendant raising a sufficiency of the evidence claim will argue that the prosecution failed to prove the required elements of a

-1-

given crime.  See, e.g., *Meissner*, 294 Mich App at 452 ("We view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found *the essential elements of the crime* to have been proved beyond a reasonable doubt.") (emphasis added).  The affirmative defense of insanity does not encapsulate an "element" of second-degree murder.  However, this Court has nonetheless applied sufficiency of the evidence analysis to a jury's determination of whether a defendant is legally insane.  See *McRunels*, 237 Mich App at 182.  Thus, the inquiry is whether sufficient evidence was presented so that "a rational trier of fact could have found that [a] defendant was not legally insane at the time of the incident." *Id.*

> Under MCL 768.21a(1),
>
> It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense.  An individual is legally insane if, as a result of mental illness . . . that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law.

The defendant bears the burden of proving insanity by a preponderance of the evidence.  *People v Lacalamita*, 286 Mich App 467, 470; 780 NW2d 311 (2009).  Moreover, once the defendant has produced evidence supporting insanity, "[t]he prosecution is not shouldered with the burden of proving the failure of an affirmative defense." *People v Mette*, 243 Mich App 318, 330; 621 NW2d 713 (2000).  In other words, once the defendant "produces sufficient evidence of the elements of the defense, then the question whether the defendant has asserted a valid defense is for the jury to decide." *People v Kolanek*, 491 Mich 382, 411-412; 817 NW2d 528 (2012).  Additionally, "a trier of fact is not bound to accept the opinion of an expert." *People v Kanaan*, 278 Mich App 594, 620; 751 NW2d 57 (2008) (citation and quotation marks omitted).

Here, defense counsel presented the testimony of forensic examiner Ellen Garver, who concluded that defendant was legally insane when he struck Potter to death.  Garver based her conclusion on defendant's year-and-a-half history of "severe mental illness."  Garver took into account defendant's constant delusion that individuals were trying to kill him, and noted the seriousness of this delusion by observing that defendant had lost approximately 40 pounds because he would not eat "poisoned" food.  Garver also took into account defendant's psychotic episode with his brothers, in which he approached his brothers with a pair of scissors, and subsequently, told responding police officers that they were "destroyers."  Garver also considered defendant's bizarre actions at BCM prior to the murder.  Defendant was muttering to himself, "Willie, quit messing with me."  Defendant also paced back and forth, talking to himself at BCM.

While Garver's expert testimony supported defendant's claim that he was legally insane, a rational jury could nevertheless have found that defendant was not legally insane by a preponderance of the evidence.  The prosecution presented evidence showing that while defendant was mentally ill, he nevertheless exhibited the ability to choose his conduct and he

was lucid and aware of the wrongfulness of his actions during the attack. For example, as the prosecution argued, defendant selected a vulnerable victim[1], and he attacked soon after the only male employee on the floor announced within earshot of defendant that he was going to run downstairs to get some supplies, leaving only two female employees on the floor. Viewed in a light most favorable to the prosecution, these acts showed that defendant had the ability to conform his conduct because he waited until the opportunity was ideal to attack Potter. While the attack was underway, one of the female employees ran into the room and ordered defendant to cease beating Potter. The employee testified that defendant briefly stopped the beating and "rush[ed] towards" her, causing her to back out of the room. Defendant then turned off the light, shut the door, and continued his assault.[2] Viewed in a light most favorable to the prosecution, this could be viewed as evidence that defendant understood what he was doing, as he tried to prevent the employee from intervening in the attack. Immediately after the attack, defendant exclaimed that "[Potter] fucking attacked me. You all fucking know it." That defendant was adamant in deflecting culpability from himself by blaming Potter for the attack reasonably supports a conclusion that defendant knew that what he was doing wrong when he beat Potter. After the attack defendant went into the bathroom, washed his hands, donned apparel to partially cover his naked body, and asked whether Potter had HIV; defendant's inquiry could be interpreted as his being self-aware of his surroundings and the potential consequences of his actions.[3] Further, according to the employee who tried to intervene, defendant's demeanor changed after police officers arrived in the room. The employee recalled that defendant put his hands up and complied with the officers, whereas before the police officers arrived, he refused to comply with commands to stop beating Potter. This again could be viewed as evidence that defendant was aware of his conduct.

In addition, two days after the attack, defendant was presented with a search warrant for the collection of evidence. When the investigating detective announced that the forensic nurse examiner would begin taking swabs from defendant's hands, defendant began licking and spitting on his fingers and attempting to clean his fingernails with his teeth. He was ordered to stop and had to have his hands physically restrained for the collection of evidence. The officer then announced that they were going to collect fingernail clippings from defendant. Defendant immediately brought his hands to his mouth and started chewing on his fingernails. He was ordered to stop, and the officers had to physically force defendant's hands onto his lap. Defendant then balled his hands into fists to prevent the forensic nurse examiner from collecting fingernail clippings. The officers had to physically extend defendant's fingers to obtain the clippings. Defendant also attempted to cover his hands while the forensic nurse examiner was

---

[1] Potter was 80-years old at the time of the incident; he was also sick with the flu and in a weakened state.

[2] Although defendant shut the door, the employee could still hear the continued assault.

[3] Although reasonable minds could conclude that defendant's concern regarding whether Potter had HIV was a mere manifestation of his prior irrational fear of having HIV, rather than a cogent concern arising from his exposure to Potter's blood, we must view the evidence in the light most favorable to the prosecution.

taking photographs of them. The fact that defendant tried to destroy and prevent the collection of evidence also plausibly supports the conclusion that he knew he was facing punishment for his actions, thus signaling an awareness of the wrongfulness of his actions. Collectively, these fragments of evidence plausibly support the conclusion that while mentally ill, defendant was not legally insane during the attack. The prosecutor also cross-examined Garver and elicited several concessions from her, including that she was unaware of defendant's attempts to prevent police from collecting forensic evidence from him two days after the incident, that reasonable experts can come to opposite conclusions on whether a person is legally insane, that the field of evaluating legal insanity can be very subjective, that the determination of "insanity" is a legal standard, not a medical one, and that it is possible defendant manipulated what he told her in an effort to mitigate his accountability. Accordingly, although defendant presented an expert witness who concluded that defendant was legally insane, a rational jury could have found that the insanity defense was not proven by a preponderance of the evidence considering defendant's actions before, during, and after the attack. Therefore, sufficient evidence was presented to support the jury's finding that defendant was not legally insane at the time of the attack.

Next, defendant argues, in nearly identical fashion to his sufficiency of the evidence argument, that the jury verdict was against the great weight of the evidence because an expert witness clearly testified that defendant was legally insane during the attack, and the prosecution failed to rebut the expert testimony. We disagree.

We review "for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence." *Lacalamita*, 286 Mich App at 469. "An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of reasonable and principled outcomes." *Id.*

"The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Id.* "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Id.*

The jury's verdict was not against the great weight of the evidence. As mentioned above, the prosecution presented evidence that could potentially instill doubt in the minds of the jurors that defendant was legally insane at the time of the attack. Evidence was presented showing that he carefully chose the time and circumstances under which to attack Potter, he tried to blame Potter for the attack, he tried to destroy evidence, and he was concerned for his own well-being by asking whether Potter had HIV. Such facts reasonably support the jury's finding that defendant was not legally insane at the time he killed Potter, as they counter Garver's testimony concluding that defendant was legally insane at the time of the killing. And there is no evidence that the jury's verdict was the result of "causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Id.* Thus, the trial court's conclusion that the jury's verdict was not against the great weight of the evidence, and its consequent denial of defendant's motion a new trial, was not outside the range of reasonable and principled outcomes. See *id.*

Finally, defendant claims that the trial court's practice of referring to prospective jurors by their badge numbers, and not their names, and by further failing to give a cautionary instruction, was a violation of due process. We disagree.

To preserve a claim that the trial court wrongfully referred to prospective jurors by numbers rather than by their names, a defendant must "object to the trial court's referring to the jurors by numbers . . . ." *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). Here, defendant did not object to the trial court's practice of referring to prospective jurors by their badge numbers. Therefore, this issue is unpreserved for appellate review.

Unpreserved issues, both constitutional and nonconstitutional, are reviewed for plain error. *Id.* Plain error analysis requires three findings: 1) error, 2) that is plain, 3) which affects substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). A plain error will generally affect substantial rights when there is a showing of prejudice—"that the error affected the outcome of the lower court proceedings." *Id.* Once the three findings for plain error are met, "reversal is warranted only when the plain . . . error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (citation and quotation marks omitted).

A trial court's practice of referring to prospective jurors by numbers instead of their names potentially implicates the use of an "anonymous jury." *Hanks*, 276 Mich App at 93. The use of an "anonymous jury" implicates two significant interests: "(1) the defendant's interest in being able to conduct a meaningful examination of the jury and (2) the defendant's interest in maintaining the presumption of innocence." *Id.* (citation and quotation marks omitted). This Court has defined an "anonymous jury" as "one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public." *Id.* (citation and quotation marks omitted). However, the precise technical definition of "anonymous jury" is evasive, and this Court has defined it by describing what it is not. An "anonymous jury" is "something more than just the jurors' names [being] withheld from the parties," and furthermore, additional "biographical information about potential jurors" must be withheld from the parties. *Id.* (citation and quotation marks omitted). Ultimately, "[a] challenge to an 'anonymous jury' will only succeed where the record reflects that withholding information precluded meaningful voir dire or that the defendant's presumption of innocence was compromised." *Id.*

An anonymous jury was not impaneled in defendant's case. Although the trial court referred to potential jurors by badge numbers, other biographical information was clearly not withheld from the parties. The prospective jurors were thoroughly asked about their occupations, marital statuses, family information, and educational backgrounds. Voir dire elicited detailed information from the prospective jurors spanning hundreds of pages of trial transcript. Therefore, only in a literal sense was the jury "anonymous." Furthermore, defendant's presumption of innocence was not compromised. See *id.* Additionally, the trial judge explicitly told the potential jurors the following:

Please know that it's my rule in every single case and it has been for going on 12 years that I always refer to jurors by their juror number or their seat number.

> Only because, (a), I'll probably mispronounce your name and I don't . . . want to do that, and the jurors generally tend to feel more comfortable with that, so I've asked the attorneys to do that also so don't think they they're rude or inconsiderate because they call you by a number.

The trial judge clearly informed the potential jurors that the number reference practice was largely only a logistical tool that it applied in all cases, and that it bore absolutely no weight on defendant's presumption of innocence. Defendant's contention that the trial court failed to give any sort of cautionary instruction is inaccurate. Accordingly, an "anonymous jury" was not impaneled, and defendant's due process rights were not violated.

Affirmed.


/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Jane M. Beckering