# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

RICARD WALTER TAYLOR,

       Defendant-Appellant.

UNPUBLISHED
January 24, 2017

No.   328764
Ingham Circuit Court
LC No.   14-000938-FC

Before:  M. J. KELLY, P.J., and STEPHENS and O'BRIEN, JJ.

PER CURIAM.

A jury found defendant, Ricard Walter Taylor, who suffers from schizophrenia, guilty but mentally ill of two counts of first-degree murder, MCL 750.316, one count of carrying a concealed weapon, MCL 750.227, two counts of carrying a weapon with unlawful intent, MCL 750.226, and two counts of possession of a firearm during the commission of a felony, MCL 750.227b.  The trial court sentenced defendant to concurrent sentences of life in prison without the possibility of parole for the murder convictions and 40 to 60 months in prison for the carrying convictions and to a two-year consecutive sentence for the possession conviction.  He appeals as of right.  We affirm.

Defendant's convictions arise out of the shooting deaths of Michael Addo and Jordan Rogers.  On May 12, 2014, defendant shot and killed Addo, a pharmacist at a Rite Aid in Lansing, Michigan, and Rogers, his neighbor in East Lansing, Michigan.  Defendant claimed that he had delusions and hallucinations regarding Addo's and Rogers's identities and intentions at the time of the shootings.  Thus, the primary issue presented to the jury at trial was whether defendant was legally insane when he committed the crimes at issue.  As reflected by the verdicts, the jury found that defendant was guilty but mentally ill, not legally insane.  On appeal, defendant challenges the jury's conclusion in this regard.

This Court reviews a defendant's sufficiency challenge de novo.  *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).  In reviewing such a challenge, this Court views the record in a light most favorable to the prosecution to determine whether a rational factfinder could have found each of the essential elements of the charged offenses beyond a reasonable doubt.  *Id*.  In doing so, we are "required to draw all reasonable inferences and make credibility choices in support of the jury verdict."  *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).  When a defendant's sufficiency challenge is premised on the jury's rejection of his or

-1-

her insanity defense, our inquiry is whether sufficient evidence was presented so that a rational factfinder could have found that the defendant was not legally insane at the time of the crimes at issue. *People v McRunels*, 237 Mich App 168, 182; 603 NW2d 95 (1999).

MCL 768.21a(1) provides, in pertinent part, that "[i]t is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense." The defendant bears the burden of proving his or her insanity by a preponderance of the evidence. MCL 768.21a(3); *People v Lacalamita*, 286 Mich App 467, 470; 780 NW2d 311 (2009). Once a defendant produces evidence supporting his or her insanity claim, "[t]he prosecution is not shouldered with the burden of proving the failure of an affirmative defense." *People v Mette*, 243 Mich App 318, 330; 621 NW2d 713 (2000). Stated differently, when a defendant "produces evidence of the elements of a defense, then the question whether the defendant has asserted a valid defense is for the jury to decide." *People v Kolanek*, 491 Mich 382, 411-412; 817 NW2d 528 (2012). In doing so, a jury is not bound by an expert's opinion. *People v Kanaan*, 278 Mich App 594, 620; 751 NW2d 57 (2008).

In this case, the parties each presented the testimony of witnesses who were qualified as experts in forensic psychology: Dr. Ellen Garver for defendant, and Dr. Jeffrey Wendt for the prosecution.

Defendant's expert witness, Dr. Garver, testified that she reviewed a variety of materials prior to interviewing defendant, including the court order requesting the evaluation, the police report, supplemental reports prepared by law enforcement, witness statements, a video of defendant's interrogation, "most but not all" of defendant's mental health records, and the results of psychological testing that was performed on defendant after his arrest. After reviewing these materials, Dr. Garver conducted a multiple-day interview with defendant that lasted more than 11 hours. As a result of her review of the materials and interview with defendant, Dr. Garver opined that defendant's actions in this case were the result of delusions and hallucinations, and that these delusions and hallucinations were exacerbated at the time of the shootings because defendant discontinued taking his medications in the months leading up to the shootings.

Dr. Garver explained that defendant believed that his family had infiltrated the Nation of Islam as intelligence officials, was concerned that the Nation of Islam had discovered his connection with those activities, and that this connection placed him in danger. According to Dr. Garver, defendant cited examples such as President Barack Obama's appearance in Michigan in February 2014, as support for his beliefs, explaining that the President "was signaling Muslims or . . . Nation of Islam people to step up the monitor of him . . . ." Dr. Garver also explained that defendant reported seeing humans changing to werewolves, believing that werewolves could become immortal, and being concerned that he had been bitten or scratched. In addition to werewolves, defendant also described seeing people as "weird animalistic spiders," "terminators," "[a]liens," "weird plant people," and "zombies."

With respect to Addo, Dr. Garver explained that defendant recalled observing "a scar on the back of his neck," a trait that defendant and Addo shared. Dr. Garver testified that defendant believed that this shared trait meant that "Addo might be trying to steal his identity or that he really wasn't who he claimed to be." With respect to Rogers, Dr. Garver explained that defendant felt that Rogers was spying on him, thought Rogers had been trying to get things out

of his apartment, believed that Rogers was a member of the Nation of Islam, thought that Rogers had a relationship with someone who intended to kill him from Detroit, Michigan, and was concerned that Rogers was neglecting, molesting, and abusing his own children. During both shootings, according to Dr. Garver, defendant reported that Addo and Rogers both "morph[ed]" into werewolves. She testified that defendant felt he had to kill each of them "to save his life and the lives of other people" because werewolves "bec[o]me immortal and your bullets won't have any effect on them." Accordingly, Dr. Garver opined that defendant was legally insane at the time he committed the crimes at issue.

The prosecution's witness, Dr. Wendt, testified that he reviewed a variety of materials prior to interviewing defendant as well, including the police report, supplemental reports prepared by law enforcement, witness statements, defendant's statement, defendant's mental health records, the results of psychological testing that was performed on defendant, and the report prepared by Dr. Garver. Like Dr. Garver, Dr. Wendt also conducted a multiple-day interview with defendant after reviewing these materials, with his interview lasting more than eight hours. As a result of his review of the materials and interview with defendant, Dr. Wendt opined that defendant's actions in this case were reality-based and not the result of delusions and hallucinations. Dr. Wendt primarily pointed to various inconsistencies in defendant's recollection of the events at issue in this case. Dr. Wendt described his interview with defendant as "a very different presentation than when he had provided earlier accounts." Dr. Wendt found it notable that defendant did not mention werewolves, lycans, vampires, or the Nation of Islam during his interviews with law enforcement or in a post-arrest phone call to his brother but was able to bring it up immediately during their interview. Relatedly, Dr. Wendt also pointed to the fact that defendant "returned to his apartment or house and put the gun back in the case" after shooting the victims, which conflicted with his claimed belief "that there was an ongoing vampire and werewolf war and the Nation of Islam is conspiring against you to the point where you are in danger and you have to shoot people[.]"

Similarly, Dr. Wendt questioned the credibility of defendant's delusions and hallucinations in light of his testimony that, despite seeing werewolves and lycans at the bar the night before the shooting, he nevertheless remained at the bar dancing and flirting with a woman because he "didn't want to make a big hoopla." Dr. Wendt stated, "In my opinion it doesn't add up. It's inconsistent. It makes me believe that that was not his true mental state during that time frame." Dr. Wendt additionally found it important that defendant appreciated that legal distinction between shooting Rogers in Rogers' home and shooting Rogers in his home in self-defense, explaining as follows:

> [A]n important part is that during the heat of the conflict where he's arguing in and fighting that night he did not shoot [Rogers], but once he had a chance to go home for the night, he returned later and unprovoked, other than the provocation from the previous night, that's when he said he shot the man because of the, being a lycan, and his paranoia.

Accordingly, because of the inconsistency in defendant's recollection of events, Dr. Wendt ultimately opined that defendant appreciated the difference between right and wrong and could control his actions.

Applying the rules set forth above, we conclude that there was sufficient evidence to support the jury's rejection of the insanity defense. The parties presented conflicting testimony as to whether defendant was legally insane at the time of the shootings, and the jury appears to have accepted Dr. Wendt's testimony. Stated differently, the jury found Dr. Wendt's testimony credible. We defer to the jury's credibility determination in this regard. *Kanaan*, 278 Mich App at 619. As stated above, the prosecution was not required to disprove defendant's insanity defense any further, *Mette*, 243 Mich App at 330, and the jury was free to find it valid or invalid, *Kolanek*, 491 Mich 382, 411-412. Defendant claims that Dr. Wendt's opinion was not based "on any objective or verifiable professional criteria," but the record, as illustrated above, refutes this conclusion. While Dr. Wendt's testimony contradicted that of Dr. Garver, both experts' opinions were based on objective and verifiable professional criteria. Indeed, both experts relied on similar materials, psychological tests, and experience, but they ultimately reached different conclusions. The disparity in their ultimate conclusions, alone, is certainly not sufficient to render Dr. Wendt's expert opinion so implausible that a reasonable juror could not have believed it. Thus, the evidence presented by the prosecution was sufficient to support the jury's guilty-but-mentally-ill verdicts in this case.

Defendant also argues on appeal that a single instance of prosecutorial misconduct requires reversal of his convictions. Specifically, defendant takes issue with the following comment by the prosecutor during closing argument: "Defendant is charged with first degree premeditated murder. You will be getting an instruction on a lesser offense of second degree murder. It's not applicable in this case. It's not applicable." The prosecutor continued, arguing that the elements of first-degree murder were proved beyond a reasonable doubt during the trial in this case. According to defendant, this argument deprived him of his constitutional right to a fair trial because it interfered with the jury's role of determining the applicable crime. Reviewing the comments at issue in context, *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004), however, we cannot agree. The prosecutor was not arguing that the jury should not consider second-degree murder; rather, the prosecutor was arguing that the evidence established that defendant had committed first-degree, not second-degree, murder. This was consistent with both parties' theory of the case—whether defendant was legally insane at the time of the shootings, not whether first-degree or second-degree murder was more applicable under the facts and circumstances of the case. See *People v Garcia*, 448 Mich 442, 472; 531 NW2d 683 (1995) (providing that second-degree murder is always a lesser-included offense of first-degree murder). Furthermore, jurors are presumed to follow their instructions, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), and the trial court instructed the jury to return a verdict based on the law as provided by the trial court, not the attorneys. Thus, any prosecutorial misconduct was presumptively cured by this instruction, and defendant does nothing to overcome that presumption.

Affirmed.

/s/ Michael J. Kelly
/s/ Cynthia Diane Stephens
/s/ Colleen A. O'Brien

-4-