*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ASTRIT G. BUSHI,

        Defendant-Appellant.

UNPUBLISHED
September 19, 2024

No. 365859
Oakland Circuit Court
LC No. 2022-281947-FC

Before: MURRAY, P.J., and BORRELLO and MARIANI, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial conviction of first-degree premeditated murder, MCL 750.316(1)(a). Defendant was sentenced to life imprisonment without the possibility of parole (LWOP). We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 1:30 a.m. on August 11, 2022, defendant bludgeoned the victim to death with a metal pole during their overnight work shift at the General Motors (GM) Assembly Plant in Lake Orion, Michigan. Defendant and the victim's team leader testified that, several minutes prior to the incident, he had assigned defendant and the victim to work together at the sanitation dock in the executive garage. Defendant and the victim had worked together several times in the past without issue. Approximately eight minutes later, the team leader received a phone call from the victim, during which the victim sounded panicked and was yelling at defendant. As the team leader and the shift supervisor drove over[1] to the sanitation dock in response to the victim's call, the team leader received another panicked phone call from the victim, who told the team leader that they "need[ed] to get over here right now" because defendant was "going crazy."

---

[1] The team leader testified that the sanitation dock was located on the opposite side of the plant from where he and the shift supervisor were located and, given the size of the plant, a golf cart was necessary to travel from one end of the plant to the other.

The team leader and the shift supervisor testified that when they arrived at the sanitation dock, they saw defendant pacing by the victim, who was lying on the floor near the trash compactor, apparently unconscious. The victim had a large head wound and was covered in blood. There was a large pool of blood on the ground, and a large streak of blood led from the pool of blood to the victim. Defendant and the victim were the only two employees working in that area at that time. When the team leader asked defendant what had happened, defendant stated that the victim had tried to kill him. The team leader attempted to medically assist the victim, as did the plant security supervisor, police officers, and emergency medical services (EMS) upon their arrival, but the victim ultimately died from his injuries.

Multiple investigating deputies and a forensic investigator[2] described the crime scene to the jury.[3] There was a large pool of blood on the ground near the dock entrance, and a black cap and an earbud lay nearby. The victim, who was covered in blood and appeared to have been beaten to death, lay on wooden pallets near the trash compactor. There were large streaks of blood on the ground spanning approximately 20 to 25 feet, and it appeared as if somebody had dragged the victim's body from the dock entrance to the trash compactor. A metal pole covered in blood, brain matter, and bone fragments leaned against the trash compactor approximately three feet from the victim's head. Two deputies noted that there was also blood on defendant's clothes and shoes, and the forensic investigator noted that there was blood spatter on the trash compactor, the area surrounding the trash compactor, and both sides of a nearby forklift. Later forensic analysis revealed that all of the blood came from the victim.

The county's assistant medical examiner testified that an autopsy of the victim revealed that he had sustained numerous blunt-force injuries to his head, face, back, and upper and lower extremities that were consistent with being struck repeatedly with a hard object.[4] The blows to the victim's face and head, which resulted in gaping lacerations, severe facial fractures, and a large depression in the skull, were the most severe and ultimately fatal. The medical examiner testified that such severe injuries required a "tremendous amount of force," and the metal pole collected at the scene was consistent with the type of object that created the victim's injuries. The medical examiner further testified that the injuries on the victim's arms were consistent with defensive wounds and that the dirt and debris embedded in abrasions on the victim's back were consistent with the victim having been dragged on the ground.

Defendant was taken into custody shortly after the police arrived at the plant. Two responding deputies testified that, despite what had occurred, defendant exhibited a very calm and casual demeanor throughout the whole ordeal. Another responding deputy testified that, shortly after his arrest, defendant complained of side pain and was thereafter transported to a nearby hospital for a medical examination. The attending physician testified that defendant complained

---

[2] The forensic investigator testified on behalf of the prosecution as an expert in laboratory and crime scene analysis.

[3] Several photographs of the crime scene, which matched the witnesses' descriptions, were also admitted as evidence and provided to the jury.

[4] The medical examiner testified on behalf of the prosecution as an expert in forensic pathology.

of mild pain on the left side of his abdomen and reported that he may have been hit with something. When the physician examined defendant, however, he did not see any lacerations, contusions, or other evidence of trauma to defendant's body, nor did defendant have any "significant reproducible tenderness" indicating internal injuries. The deputy who took defendant into custody and the deputy who later took photographs of defendant at booking both similarly testified that they did not see any injuries on defendant's body.

The plant security supervisor testified that she interviewed defendant to complete an incident report before he was taken into police custody, and defendant told her that the victim had threatened to kill him during their shift and that, out of anger, defendant picked up a metal pole and hit the victim in response. Defendant later stated, however, that he had blacked out and did not remember hitting the victim. When she asked defendant what initiated the incident, defendant stated that it started over a dispute about money. A detective testified that he recovered messages[5] between defendant and the victim from defendant's phone indicating that defendant had loaned the victim several hundred dollars and that, despite defendant's repeated requests to the victim to repay the loan, the victim had not done so.[6] During one of the exchanges, defendant warned the victim that he "better not show up" to work "empty handed" and that they would "have some problems" if he did not repay the debt. During another exchange, defendant told the victim that he would not "accept any apology or excuses" for his failure to repay the debt, that the victim needed "to go to Jesus for help," and that a "scum bag" like him "should never deserve to live."

Defendant testified on his own behalf, focusing on the core theory of his defense: that he killed the victim in self-defense. Defendant admitted that he had gotten into an argument with the victim about the unpaid debt and later struck the victim multiple times with a metal pole, but he maintained that he did so only because the victim had threatened and attacked him and he was therefore afraid for his own life. Defendant explained that sometime before the incident, the victim had told him that he had previously committed violent acts against others and that he was a "hothead" who got out of control in conflicts. Defendant further testified that the victim, in response to defendant's questions about the unpaid debt, told defendant, " 'Don't ask me [about the money] again,' in a tough way," and that the victim told another individual on the phone that "next time [the victim] was going to kill him." Thus, according to defendant, when the victim later poked him in the left side with a metal pole, he "fear[ed] that [the victim] might do something" more to him. Defendant admitted that after the victim poked him with the metal pole, he wrestled the metal pole away from the victim and "gave him a whack" on the side of the head. According to defendant, the victim became upset, threatened that he would have defendant arrested or killed, and lunged at him, and a physical altercation ensued. Defendant admitted that the victim eventually tried to disengage from the altercation but that defendant nonetheless overpowered and subdued the victim because he was afraid that the victim was concealing a gun in his bag and would use it against him.[7] Defendant also admitted, however, that he struck the victim to

---

[5] A copy of all of the messages were also admitted as evidence and provided to the jury.

[6] The detective testified on behalf of the prosecution as an expert in cell phone data extraction.

[7] No gun was ever found at the crime scene, on the victim's person, or amongst the victim's personal belongings.

demonstrate that he would not allow the victim to take advantage of him. Defendant denied dragging the victim's body to the trash compactor to dispose of it and stated that he did so only to "leave room for an ambulance or somebody to come in" and that the victim was still breathing as he did so.

Defendant was convicted and sentenced as previously described. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that his conviction for first-degree murder must be reversed because the prosecution presented insufficient evidence to prove beyond a reasonable doubt that he premeditated and deliberated the killing of the victim. We disagree.

## A. STANDARD OF REVIEW

"This Court reviews a challenge to the sufficiency of the evidence by examining the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Clark*, 330 Mich App 392, 436; 948 NW2d 604 (2019) (quotation marks and citation omitted). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of a crime, and it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019) (quotation marks, citations, and alteration omitted). It is the trier of fact's role to determine "the weight of the evidence [and] the credibility of witnesses," and we will not interfere with that role. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Stated differently, "a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted).

## B. ANALYSIS

To convict a defendant of first-degree premeditated murder, the prosecution must prove beyond a reasonable doubt that the defendant intended to kill the victim and that the intent to kill was both premeditated and deliberate. *Clark*, 330 Mich App at 436. "[T]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Oros*, 502 Mich at 240 (quotation marks and citation omitted). While "premeditation and deliberation are separate elements . . . , the same facts may tend to establish each element, and they are subjective factors usually incapable of direct proof absent an admission or confession by the defendant." *Id.* at 241. "The requisite state of mind may be inferred from [the] defendant's conduct judged in light of the circumstances." *Id.* at 243 (quotation marks and citation omitted).

"Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a second look." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 10 (quotation marks and citation omitted). "[S]ome time span between the initial homicidal intent and ultimate action is necessary to establish

premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Oros*, 502 Mich at 242 (quotation marks and citation omitted). "While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds." *Smith*, ___ Mich App at ___; slip op at 10 (quotation marks and citation omitted). Premeditation and deliberation may also be established through evidence of "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Walker*, 330 Mich App at 384 (quotation marks and citation omitted). For example, the nature and number of a victim's wounds may be used to support a finding of premeditation and deliberation. *People v Unger*, 278 Mich App 210, 230-231; 749 NW2d 272 (2008). That said, "the brutality of a killing alone does not support the elements of premeditation and deliberation." *Smith*, ___ Mich App at ___; slip op at 11.

The prosecution in this case presented sufficient evidence from which a rational jury could find that defendant intentionally killed the victim with premeditation and deliberation. Multiple witnesses, including defendant, testified that he and the victim had worked together for several months. Defendant testified that he had previously loaned the victim several hundred dollars and that the victim had refused to pay him back, and a detective testified that he had recovered phone messages between defendant and the victim reflecting as much. Defendant sent several threatening messages to the victim in the weeks leading up to the incident, including messages stating that the two would "have some problems" if the victim did not repay the debt, the victim "better not show up" to work "empty handed," and a "scum bag" like the victim did not "deserve to live." Defendant testified that he physically fought the victim and feared for his life, but several witnesses testified that there was no evidence indicating that defendant had engaged in a physical altercation or had otherwise been attacked. Conversely, the medical examiner testified that the victim had a multitude of severe blunt-force injuries all over his body and defensive wounds on his arms. Defendant admitted that he struck the victim multiple times to demonstrate to the victim that he would not be taken advantage of, and the timeline of events established through the proofs at trial indicate that there was sufficient time and opportunity for defendant not only to form the intent to kill the victim, but to consider that course of action and take a "second look." See *Oros*, 502 Mich at 242-243. This is only further supported by the medical examiner's testimony that the victim's blunt-force injuries were consistent with being struck repeatedly with a hard object with a "tremendous amount of force" and defendant's own testimony that he continued to attack the victim as the victim attempted to flee. When viewing this evidence in a light most favorable to the prosecution, a reasonable jury could have readily inferred from the facts and circumstances presented that defendant intended to kill the victim and did so with premeditation and deliberation. See *Clark*, 330 Mich App at 436. Therefore, there was sufficient evidence to support defendant's conviction of first-degree premeditated murder.

## III. SPECIFIC-ACTS EVIDENCE

Defendant argues that the trial court erred by excluding evidence of specific prior acts of violence reportedly committed by the victim because such evidence was relevant to his claim of self-defense. "We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *People v Hoskins*, 342 Mich App 194, 200; 993 NW2d 48 (2022). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision

falls outside the range of principled outcomes. A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019) (quotation marks and citations omitted). Whether a rule of evidence precludes admissibility is a preliminary question of law that we review de novo. *Hoskins*, 342 Mich App at 200. A preserved trial error in the admission or exclusion of evidence does not warrant reversal unless, after an examination of the entire cause, it affirmatively appears "that it is more probable than not that the error was outcome determinative." *People v Propp (On Remand)*, 340 Mich App 652, 661-662; 987 NW2d 888 (2022) (quotation marks and citation omitted).

MRE 404 and MRE 405 govern the admissibility of character evidence. *People v Edwards*, 328 Mich App 29, 34; 935 NW2d 419 (2019). Although "[e]vidence of a person's character or a trait of character" is generally inadmissible to prove that a person "act[ed] in conformity therewith on a particular occasion," a defendant charged with homicide may nonetheless admit evidence of the victim's aggressive character "[w]hen self-defense is an issue." MRE 404(a)(2).[8] In any situation in which character evidence is admissible under MRE 404, character may be proven "by testimony as to reputation or by testimony in the form of an opinion." MRE 405(a). In instances where a person's character or character trait "is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct." MRE 405(b). Whether a defendant had a reasonable apprehension of harm—i.e., whether the defendant "had a reasonable belief that he had to use deadly force to prevent his own death or to prevent great bodily harm to himself"—at the time of the homicide is an essential element of his claim of self-defense, and it is "well-settled law that specific acts of aggression by the decedent," if known to the defendant at the time of the homicide, "are admissible to establish a defendant's reasonable apprehension of harm." *Edwards*, 328 Mich App at 35-38.

In this case, defendant sought to testify that, sometime prior to the homicide, the victim told defendant that he had killed two people in the past and had gotten away with it. Defendant argued that such testimony was necessary to establish his claim of self-defense because it shed light on his state of mind at the time of the homicide and showed that he honestly and reasonably believed that his use of deadly force was necessary to prevent the victim from severely injuring or killing him. The prosecution objected and, after discussing the matter with the parties outside the presence of the jury, the trial court ruled that defendant could not testify about the specifics of the victim's alleged statements, but could offer other testimony regarding his knowledge of the victim's violent past and aggressive disposition.

The trial court did not particularly explain the evidentiary basis for its ruling, and defendant argues that it contravened MRE 405(b). Ultimately, however, we need not resolve whether the trial court abused its discretion by excluding defendant's specific-acts evidence because, even if it did, any such error was harmless. Although the trial court precluded defendant from testifying that the victim had previously told defendant that he had killed two people and gotten away with it, the trial court nonetheless permitted defendant to testify that the victim had previously "indicate[d] to [defendant] that he had committed acts of violence in the past" and that he was a

---

[8] Our Supreme Court revised the Michigan Rules of Evidence effective January 1, 2024. We cite the version of the rules that were in effect at the time of defendant's trial.

"hothead" who "gets out of control" during conflicts. Defendant was also permitted to testify that based on the victim's previous statements, he believed that the victim had a "[v]ery dark" and "scary" past. Finally, defendant testified that on the night of the incident, the victim had threatened and physically assaulted him and that he feared that the victim had a concealed gun in his bag and would use it against him if given the opportunity. Thus, defendant was permitted to present substantial evidence demonstrating his reasonable apprehension of harm to prove his claim of self-defense. And, as already detailed, there was ample other evidence presented at trial from which a jury could conclude beyond a reasonable doubt that defendant did not act in self-defense and was guilty of first-degree premeditated murder. Given the extent of character evidence that defendant was able to present in support of his defense, and the strength of the competing evidence of his guilt, we are not convinced that "it is more probable than not" that any error in precluding defendant from offering additional character evidence "was outcome determinative." *Propp*, 340 Mich App at 661-662 (quotation marks and citation omitted). Reversal is therefore not warranted on this issue.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues in his supplemental Standard 4 brief[9] that his trial counsel was ineffective for failing to use an interpreter at every instance in which the two communicated with one another and that, as a result, he was not properly prepared to testify at trial or able to make informed legal decisions, including whether to testify in his own defense. Whether counsel was ineffective presents a mixed question of fact and law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). Defendant failed to move for an evidentiary hearing or a new trial, so our review is limited to errors apparent from the record. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

"To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Shaw*, 315 Mich App at 672. A defendant also necessarily bears the burden of establishing the factual predicate for their claim. *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018). "The effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Muniz*, 343 Mich App 437, 448; 997 NW2d 325 (2022) (quotation marks, citation, and alteration omitted).

As an initial matter, defendant has not established the factual predicate for his claim. See *Muhammad*, 326 Mich App at 63. There is no record evidence demonstrating that defense counsel failed to use an interpreter at every instance in which he communicated with defendant, and defendant has not provided an offer of proof suggesting otherwise. Nor has defendant identified

---

[9] Defendant filed a supplemental Standard 4 brief pursuant to Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

any specific point of miscommunication or misunderstanding between himself and his counsel that use of an interpreter would have remedied. Furthermore, nothing in the record suggests that defendant's understanding of English was so deficient that an interpreter was at all times necessary for counsel to communicate effectively with defendant. Defendant testified at trial with an interpreter at his side and, at the start of his testimony, he noted that he immigrated to America in 1990, English was his second language, and he still occasionally struggles to understand English words. We do not dispute this. That said, the record reflects that the overwhelming majority of defendant's testimony was provided in English, without the assistance of an interpreter, and was clearly responsive to questions posed in English.[10] There was also ample trial evidence regarding defendant's ability to adequately understand and communicate in English. All of the messages between defendant and the victim, for instance, were in English, and numerous witnesses testified that defendant communicated with them exclusively in English on a regular basis. On this record, defendant has not carried his "heavy burden" of demonstrating that counsel performed deficiently in this regard or that, had counsel used an interpreter to the extent defendant claims counsel should have, there is a reasonable probability that the outcome of defendant's trial would have been different. See *Muniz*, 343 Mich App at 448.

Affirmed.

/s/ Christopher M. Murray
/s/ Stephen L. Borrello
/s/ Philip P. Mariani

---

[10] Although the interpreter occasionally assisted during direct and cross-examination to ensure that defendant understood the specific question being asked, the interpreter's assistance was largely used to ensure that defendant understood various procedural matters, such as motions and objections made by the parties throughout trial.